# EXHIBIT 10

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
CENTRAL REGIONAL OFFICE

KAREN SENG,
                    Appellant,

          v.

DEPARTMENT OF VETERANS
    AFFAIRS,
                    Agency.

DOCKET NUMBER
CH-0752-14-0353-I-1

DATE: March 17, 2014

## ACKNOWLEDGMENT ORDER

This office has received the appellant's petition for appeal. A copy of the appeal is being sent to the agency with this Order. I am the administrative judge assigned to this appeal.

I **ORDER** the parties to follow the procedures set out in the separate notices below. If any party fails to follow my orders or the Board's regulations, I may impose sanctions pursuant to 5 C.F.R. § 1201.43. If either party has a question regarding any aspect of the case processing instructions set forth in this order, he or she may seek clarification at the phone number listed under my signature at the end of this order.

## NOTICE TO THE APPELLANT

### INTRODUCTION

If your appeal is timely filed, and within the Board's jurisdiction, you have the right to a hearing on the merits of your case. If you requested a hearing, I will schedule a hearing for you. If you did not request a hearing, you have 10 calendar days from the date of this Order to file a written request for one. If you do not request a hearing, you waive your right to one. In that event, you and the

agency will be given an opportunity to make written submissions before the record on your appeal closes.

## DESIGNATION OF REPRESENTATIVE

You may name a representative.  If you already have a representative, you must fill out the enclosed "Designation of Representative" form and file it with the Board and with the agency within 10 calendar days of the date of this Order unless you have included your representative's name, address, telephone number, and signature in your appeal. If your representative has filed the appeal for you and you have not personally signed the appeal or submitted a signed "Designation of Representative" form, you also must file a signed "Designation of Representative Form" with the Board and with the agency within 10 calendar days of the date of this Order.  If you name a representative after receiving this Order, fill out the enclosed "Designation of Representative" form and file it with the Board and the agency **immediately** after obtaining your representative.

You must **immediately** notify the Board and the agency in writing of any changes in the name, address, or telephone number of your designated representative.

If you register as an e-filer (see information below), you can use electronic filing to file a Designation of Representative, or to notify the Board of a change in contact information.

## DISCOVERY

Discovery is the procedure you may use to learn of any facts, documents, or other evidence the agency has that may be helpful to your case.  If you wish to engage in discovery, initial requests or motions must be served on the other party within 30 calendar days of the date of this Order.  Responses to initial discovery requests must be served promptly but no later than 20 days after the date of service of the other party's discovery request or the MSPB order.  Unless you are filing a motion to compel, you must not submit your discovery requests and

responses to the Board. If you do, they will be rejected and returned to you. The procedures used for discovery are at 5 C.F.R. §§ 1201.71-.85.

It is the policy of the Board to decide an appeal within 120 calendar days of receipt. The Board expects all parties to assist in the expeditious processing of this case by honoring requests for relevant documents and producing material witnesses without additional Board intervention.

The regulations require that the parties attempt to resolve a discovery dispute before filing a motion to compel with me. Thus, the party who disputes the other's compliance must discuss the anticipated motion with the other party, and they both must make a good faith effort to resolve the dispute and narrow their disagreement. They must also include with any motion a statement indicating that they have complied with this requirement. 5 C.F.R. § 1201.73(c)(1).

## RESPONSE TO MOTIONS

You may file a response or objection to any motion filed by the agency. Unless otherwise specified by me or the Board's regulations, your response or objection must be filed with this office and served upon the agency within 10 calendar days of the date that appears on the agency's certificate of service. I will reject any untimely response or objection unless you show good cause for the delay in filing. **Note that if, prior to the close of the record, you fail to object to any of my written or verbal rulings on a matter raised by you or the agency, you will be precluded from challenging that ruling on petition for review or cross-petition for review.**

## GENERAL INSTRUCTIONS

### FILING PLEADINGS WITH THE MSPB

A "pleading" is any written submission setting out claims, allegations, arguments, or evidence. Pleadings include briefs, motions, petitions, attachments, and responses. 5 C.F.R. § 1201.4(b). Pleadings can be filed via

postal mail, facsimile (fax), personal or commercial delivery, or in electronic format via e-Appeal Online (https://e-appeal.mspb.gov/). Pursuant to 5 C.F.R. § 1201.26, all pleadings filed with the Board must meet the following requirements:

(1) All pleadings must be legible and either printed on 8½ by 11 inch paper, or formatted so that they will print on 8½ by 11 inch paper.

(2) All pleadings must be filed by the date set by me or the Board's regulations. The date of filing is the date your submission is postmarked, faxed, the date of electronic submission if you e-file, or the date of receipt if you personally deliver it to the Board's regional office. Extensions of filing dates will only be granted if requested in writing and if good cause is shown. **A continuance of a hearing date will be granted only if requested in writing in accordance with the Board's regulation at 5 C.F.R. § 1201.51(c), which requires an affidavit or sworn statement, and if you are able to show extraordinary circumstances.**

(3) All pleadings must be served upon opposing parties and their representatives, must be accompanied by a certificate of service stating (a) the names and addresses of the parties served; (b) the manner of service (personally delivered, mailed, faxed, or electronic delivery); and (c) the date of service. A certificate of service is attached to this Order and lists the names and addresses of the parties who must be served in this case. The attached certificate of service constitutes a model which you may follow in preparing your own certificate of service. The Board may reject a submission that does not have a certificate of service. If you register as an e-filer, a certificate of service will be prepared automatically as part of the pleading you file online.

**Pleadings Submitted in Hardcopy**

When a pleading submitted by postal mail, fax, personal or commercial delivery includes three or more documentary attachments, the attachments should be "tabbed." A "tab" is a dividing page, a portion of which extends beyond the normal 8½ inch width of the paper, and which contains a description or label. When such a pleading is submitted via fax, each page of the attachments should be sequentially numbered and the attachments should be preceded by a table of contents describing each attachment and indicating the page on which it starts.

Special instructions for preparing the Agency's response to the appeal under 5 C.F.R. § 1201.25 are included below.

All documents within a tab must have new page numbers (by hand if necessary) so that each document, within each tab, is re-numbered, from the first page of the first document to the last page of the last document. This will allow for specific page references to the record, by tab and by page number within a tab. The new page numbers should be placed in the bottom right-hand margin of each page. If some pages within a tab are already numbered in the bottom-right margin, parties should place the new page numbers just to the right of the original page numbers.

**Pleadings Submitted via e-Appeal Online**

Electronic bookmarks and tables of contents take the place of physical "Tabs" in pleadings filed by traditional means. When an e-filed pleading contains three or more electronic supporting documents, each attachment must be identified, either by filling out the table for such attachments at e-Appeal Online, or by uploading the supporting documents in the form of one or more PDF files in which each attachment is bookmarked. 5 C.F.R. § 1201.14(g)(3).

Regardless of whether it is uploaded or entered online, each pleading will be assembled into a single PDF document, which will include all electronic attachments, and will contain sequential page numbers. E-filers need not manually paginate their pleadings and attachments.

Pleadings are subject to a 10 megabyte size limit. To avoid exceeding this limit, e-filers are encouraged to scan documents in black and white and to adjust settings to limit file size. If what would otherwise be a single pleading must be broken into multiple pleadings because of the size limit, each should contain the same descriptive title, together with a "Part" designation in parentheses, e.g., Agency File (Part A), Agency File (Part B), etc.

For more information about e-filing, read the Board's regulation at 5 C.F.R. § 1201.14, or visit e-Appeal Online (https://e-appeal.mspb.gov/) and click the link entitled "How does Electronic Filing Work?"

## REGULATIONS

For more detailed information on these procedures, you should refer to the Board's regulations in 5 C.F.R. Part 1201. The regulations are available for review in agency personnel offices, law libraries, some large public libraries, and at the Board's website (http://www.mspb.gov). **Please note that the Board's regulations were substantially revised as of November 13, 2012. Printed copies, therefore, may not reflect the applicable regulations. You must assure that you rely only on the current regulations.**

## <u>NOTICE TO THE AGENCY/INTERVENOR</u>

### AGENCY RESPONSE

I **ORDER** the agency to read, comply with, and/or respond to any and all portions of the "Notice to Appellant" which are applicable to it. I also **ORDER** the agency to serve me, appellant, and appellant's representative (if applicable), with the material listed on the enclosed schedule and any other information required by 5 C.F.R. § 1201.25 within 20 calendar days of the date of this Order.

### DESIGNATION OF REPRESENTATIVE

The agency must designate a representative. I **ORDER** the agency to file the name, address, and telephone number of the person authorized to act for the agency on the enclosed "Designation of Representative" form within 20 calendar days of the date of this Order. The representative must have authority to settle this appeal or be able to directly reach someone with that authority on short notice.

## NOTICE TO THE PARTIES

### SETTLEMENT

The Board strongly encourages the settlement of the appeals that come before it. Even where discussions between the parties do not result in settlement, they often help to define the issues and assist the parties in agreeing to stipulations. I therefore urge the parties to contact each other to discuss the possibility of settlement as early in this proceeding as possible. I am available to assist in the discussions. The parties should discuss concrete, specific settlement proposals unless either party concludes in good faith that no compromise of any kind is possible. They must also be prepared to discuss with me the status of any settlement discussions. *See* 5 C.F.R. § 1201.41(b)(12) (the administrative judge is authorized to "[h]old prehearing conferences for the settlement and simplification of issues").

If the parties agree to settle this appeal, and to enter the agreement into the record, the Board will retain the authority to enforce its terms if the Board has jurisdiction over the appeal. However, if they do not enter the agreement into the record, or if jurisdiction has not been determined, the Board will have no authority to enforce the agreement.

FOR THE BOARD:

Dorothy L. Moran
Administrative Judge
Central Regional Office
230 South Dearborn Street, Room 3100
Chicago, IL 60604-1669
Phone: (312) 353-2923
Fax:    (312) 886-4231
V/TDD (800) 877-8339

Enclosures

## MSPB SCHEDULE 752
## REQUIREMENTS FOR AGENCY FILE

Insofar as the content of the Agency File is concerned, the instructions that follow apply in all cases. Insofar as the instructions refer to tabbing and numbering of Agency File materials, they apply only to instances in which the Agency File is submitted via postal mail, or personal or commercial delivery. **When the Agency File is submitted via e-Appeal Online, the requirements of 5 C.F.R. § 1201.14(g)(3) apply.** When the Agency File is submitted via fax, each page of the attachments should be sequentially numbered and the attachments should be preceded by a table of contents describing each attachment and indicating the page on which it starts.

### General Information

All evidence submitted will be disclosed to the parties. Therefore, no classified document can be received in evidence unless accompanied by a statement that it is declassified and that full disclosure is permitted.

### Materials Required to be Tabbed, with Pages Re-numbered within a Tab, and Filed

1.  A narrative response to the appeal and all material issues raised by appellant.

    [Indicate whether appellant is an "employee" as defined by 5 U.S.C. §7511(a)(1) or 39 U.S.C. §1005(a) (4) (A) (ii). If appellant was barred from active duty during the notice period, explain the reasons and authority for that action.]

2.  With the exception of Postal Service cases, a statement whether appellant is covered by a collective bargaining agreement and whether that agreement covers the action being appealed.

    [If so, provide a copy of the applicable provision(s) and state whether appellant has grieved the action. If appellant has, submit a copy of the grievance and indicate the date it was filed.]

3.  A statement whether appellant has filed a formal complaint of discrimination on the action being appealed.

    [If so, indicate its current status, provide a copy of the complaint, indicate the date the complaint was filed, and the agency's decision, if any.]

4.  Copies of all other documents, which are relevant and material to this appeal.

[Provide copies of the notice of proposed action; appellant's written reply and summary of the oral reply, if any; the decision letter; the SF-50 (or other notification of personnel action) documenting the action; evidence supporting the action; and documentary evidence of any past record relied upon in taking the action.]

## Instructions for Assembly of the Agency File

The agency's file must be organized as described below.  Failure to do so will result in rejection of the submission.

All documents submitted in hardcopy must be bound at the top (not the side) with a two-hole fastening device.  The holes must be 2 and 3/4 inches apart.  A cover is not required.

Documents in item 4 must be arranged by date with the most recent on top and the oldest on bottom.  Documents must be individually tabbed using the letters of the alphabet, e.g., 4a, 4b, 4c, etc.

All documents within a tab must have new page numbers (by hand if necessary) so that each document, within each tab, is re-numbered, from the first page of the first document to the last page of the last document.  This will allow for specific page references to the record, by tab and by page number within a tab.  The new page numbers should be placed in the bottom right-hand margin of each page.  If some pages within a tab are already numbered in the bottom-right margin, parties should place the new page numbers just to the right of the original page numbers.

A Table of Contents is placed on top of the tabbed documents.  Use the following headings for the Table:

Location    Date         Document Description    Source

[The "location" is the tab number; the "date" is the date of the document; the "document description" fully identifies the document; and the "source" indicates the individual or office who authored or otherwise produced the document.]

A completed Designation of Agency Representative form must be placed on top of the Table, if not previously submitted.  A transmittal letter, identifying the case by name and docket number, must be placed on top of the Designation.

A Certificate of Service must be inserted on the bottom of the tabbed file.



# Merit Systems Protection Board

## -- Designation of Representative --

### Please print or type:

**Appellant's Name:**   Karen Seng
**Agency Name:**   Department of Veterans Affairs
**Docket Number:**   CH-0752-14-0353-I-1

The parties may use this form or a similar document to designate any organization or individual to represent them before the Board.  (Appellants representing themselves do not need to submit a designation of representative).  The choice of representative must not result in a conflict of interest for the organization or person chosen.  Each party must make all arrangements for representation. **The Board does not designate a representative for any party to this appeal.** The representative(s) must be able to proceed promptly.  Normally, continuances or extensions of time **will not be granted** if the appellant or agency delays in seeking or arranging representation, if the representative cannot proceed in a timely manner, or for changes in representative(s).    Despite the designation of representative, **the parties remain personally responsible for prosecuting the case in a timely manner.**

The purpose of the representative is to assist and counsel the appellant or agency in the preparation, presentation, or defense of the appeal.  The representative appears with, or for, the party at hearings, settlement negotiations, or other proceedings before the Board.   **The representative has the authority to settle the appeal.  Any limitation on the representative's settlement authority must be filed in writing with the Board.  By designating a representative, you agree to allow the Board to disclose to your representative all information concerning the appeal.**

**DESIGNATION:**  The individual or organization named below is hereby designated to represent the

Appellant ❑              Agency ❑

in connection with this appeal before the Board.  **This individual or organization is to be served copies of all communications concerning this appeal from the Board or from the other party(ies).**  The address and telephone number of the representative provided below must be correct and specific to ensure that mail or other communications are received promptly.  Any change or cancellation of this designation **must be provided, in writing, to the Board, and to the other party(ies).**

**SERVICE METHOD:** US Mail ❑              FAX ❑              E-Mail ❑

Name of Representative: _____
Address: _____
_____
City: _____   State: _____ Zip Code: _____
Phone Number: _____ FAX: _____ Other(E-Mail, etc.): _____

Signature of Appellant or Agency Authorizing Official: _____ Date: _____

Representative's Signature: _____ Date: _____

**RETURN THIS FORM TO THE BOARD OFFICE WHERE THE APPEAL IS PENDING.  PROVIDE A COPY TO THE OTHER PARTY(IES).  <u>BOARD REGULATIONS REQUIRE THAT COPIES OF ALL COMMUNICATIONS MUST BE SERVED ON THE OTHER PARTY(IES).</u>**

## PRIVACY ACT STATEMENT

During the course of processing the appeal, which you or your representative has filed, the Merit Systems Protection Board collects personal information that is relevant and necessary to reach a decision in your case. The Merit Systems Protection Board collects this information in order to process appeals under one or more of the following authorities: Title 5 U.S.C. §§ 1302, 1221, 3301, 3302, 4302, 5115, 5338, 5345, 5346, 7151, 7154, 7301, 7501, 7512, 7701,and 8347; as well as Executive Orders 9803, 11222, 11478, 11491, and 11787. Because your appeal is a voluntary action, you are not required to provide any personal information to the Merit Systems Protection Board in connection with your appeal. Conceivably, failure to provide all information essential to reaching a decision in your case could result in the dismissal or denial of your appeal.

**DECISIONS OF THE MERIT SYSTEMS PROTECTION BOARD ARE AVAILABLE TO THE PUBLIC UNDER THE PROVISIONS OF THE FREEDOM OF INFORMATION ACT AND ARE POSTED TO THE MERIT SYSTEMS PROTECTION BOARD'S PUBLIC WEBSITE. SOME INFORMATION ABOUT THE APPEAL ALSO IS USED IN DEPERSONALIZED FORM FOR STATISTICAL PURPOSES. FINALLY, INFORMATION FROM YOUR APPEAL FILE MAY BE DISCLOSED AS REQUIRED BY LAW UNDER THE FREEDOM OF INFORMATION ACT AND THE PRIVACY ACT. *SEE* 5 U.S.C. §§ 552, 552A.**

# UNITED STATES OF AMERICA
# MERIT SYSTEMS PROTECTION BOARD

## NOTICE

## SUSPENDED APPEAL PROCEDURE

Both the appellant and the agency are entitled to have this appeal adjudicated as quickly as possible, usually within 120 days (*see* 5 U.S.C. §7702(a)(1)). In some situations, however, the parties or the judge may conclude that more time than is routinely provided should be granted. Therefore, the judge may issue an order suspending the processing of an appeal for up to 30 days. The judge may grant a second order suspending the processing of an appeal for up to an additional 30 days. No case may be suspended for more than a total of 60 days under these procedures. *See* 5 C.F.R. § 1201.28.

Should the parties contact the administrative judge during the period of suspension for assistance, and if the administrative judge's involvement is likely to be extensive, the judge will notify the parties that it will be necessary to terminate the suspension and return the case to standard processing.

## NOTICE

## ALTERNATIVE DISPUTE RESOLUTION

The Merit Systems Protection Board (MSPB), in an effort to provide alternatives to the regulatory adjudication process, offers the parties to the appeals brought to the Board several dispute resolution options. This notice will familiarize you with those possibilities so that you can consider them and discuss them with the Administrative Judge before you decide how to proceed. All options are cost free. Settling your case with the assistance of the professional who will guide the parties through the process offers your best chance of reaching a resolution of the appeal that benefits both parties. Accordingly, the MSPB urges you to be open to the possibility of such a resolution at all times.

## THE MEDIATION APPEALS PROGRAM

The Mediation Appeals Program (MAP) is a voluntary, confidential process in which the parties meet with a trained mediator in a non-litigious, non-adversarial setting. Even more than the other settlement options available, MAP encourages the parties to approach settlement with an open mind and to consider possible resolutions that may not mirror a potential outcome of the adjudication process. Both parties must agree to mediation, and the MSPB must concur that it could be beneficial, given the circumstances of the case and of the parties. Because the appeal will be outside the normal adjudication process while it is in MAP, your agreement to mediate requires that you be ready to proceed to mediation without delay, and that you be willing to finalize any settlement you may reach expeditiously. Cases should normally not spend more than 30 days in the program.

The mediator will meet with the parties and facilitate discussions between them in an effort to find common grounds on which to resolve the appeal. In some circumstances, mediations may be done by video-conference or by telephone, but they are usually done in person. If the efforts to resolve the appeal do not result in a settlement, the mediator will have no input into the adjudication of the appeal. Nonetheless, the parties are likely to return to adjudication with a better understanding of what is important to them and to the other party, which often helps them reach a settlement during the adjudicatory process. A brochure that further explains MAP is enclosed for your review or is available on-line at www.mspb.gov/map. If you have other questions specific to the mediation option, in addition to discussing them with the Administrative Judge, you may call the MAP Regional Operations Coordinator, Talethia Owens, at (202) 653-6772, ext. 1840, or e-mail at regionaloperations@mspb.gov.

## THE SETTLEMENT JUDGE PROGRAM

A Settlement Judge is an Administrative Judge like the one assigned to your appeal, but he or she is assigned specifically and solely to discuss settlement options with the parties. Like the Administrative Judge assigned to your appeal, a Settlement Judge is skilled at evaluating the parties' positions and offering sound advice on the strengths and weaknesses of each party's position. A Settlement Judge plays no part in the processes and procedures through which an appeal goes during the course of the traditional adjudication process, and has no input into the decision if the appeal does not settle. For this reason, some parties feel more open to frank discussion of their appeals and their settlement goals with a Settlement Judge.

Unlike MAP, both parties do not have to request the services of a Settlement Judge. However, there must be a genuine willingness by both parties to explore settlement before one will be appointed. Accordingly, if, after initial settlement discussions between the parties and with the assigned Administrative Judge, a party believes the assignment of a Settlement Judge would be useful, a request may be made to the Administrative Judge or the Regional Director. If the Regional Director or Chief Administrative Judge concurs, a Settlement Judge will be assigned.

## THE MSPB SETTLEMENT PROGRAM

The Administrative Judge assigned to decide your appeal will explore the possibility of settlement with the parties to almost all appeals. Thus, you need not make any election if this is the option you prefer. Through the documents filed by the parties and the evidence submitted, the Administrative Judge becomes thoroughly familiar with the case and is in the best position to discuss the strengths and weaknesses of the appeal, as well as to evaluate not just the likelihood of success but also the validity of settlement offers made by the parties, and to suggest proposals for their consideration. Administrative Judges often spend considerable time working with the parties to help them craft mutually beneficial settlements in lieu of adjudication, in which it is more likely that there will be a "winning" and a "losing" side. Any settlement discussions with the Administrative Judge, however, have no effect on the ultimate outcome of the appeal if the case does not settle.

## ELECTRONIC FILING AT THE MSPB

Parties and representatives who register as e-filers can file virtually any type of pleading, including a new appeal, in electronic form. Those who register as e-filers will receive documents issued by the Board, and pleadings filed by other e-filers, in electronic form. Registration and filing are done via the Board's e-Appeal site on the Internet: (https://e-appeal.mspb.gov). The Board's electronic filing application includes the following features:

- Both the Board and e-filers will receive electronic documents on the same day they are submitted.
- E-filers need not disclose their e-mail addresses to anyone except the MSPB.
- E-filers can either enter their pleadings online or upload them as electronic files.
- Documents can be submitted in any common electronic format, including word-processing and image formats (electronic files created by scanning paper documents).
- Should they choose to do so, e-filers will be able to submit their pleadings and supporting attachments in the form of declarations made under penalty of perjury. The Board gives greater evidentiary weight to statements in this form than to unsworn statements.
- Regardless of whether it is uploaded or entered online, each pleading will be assembled into a single PDF document, which will include all electronic attachments, and which will contain sequential page numbers. Pagination will enable everyone involved to make specific citations to the record.
- If unable to complete a pleading while online, an e-filer will be able to save his or her work and complete it during a later session.
- E-filers will be provided a confirmation of electronic filing, and will be able to print or download a copy of the assembled pleading as a PDF document.
- Service of pleadings on other e-filers will be automated.
- If you elect to be served electronically, MSPB will e-mail you notification when documents are posted to the e-Appeal repository. You will need to download or read the documents from the repository. If your mail service has spam filters, please ensure that mail from @mspb.gov is approved or check your junk folder routinely.
- When a party who is an individual is represented, the party and the representative can separately decide whether to register for e-filing. If only the representative registers for e-filing, the party will continue to receive documents by regular mail.
- Although registration as an e-filer permits participants to file pleadings electronically, they may file any pleading, or portion of a pleading, by non-electronic means.
- Registration as an e-filer can be withdrawn at any time, but while in effect means that the individual consents to accept electronic service of all documents issued by the Board and all pleadings submitted by other e-filers.

For further information about electronic filing, please read the Board's regulation at 5 C.F.R. § 1201.14, or visit the Board's regular website (http://www.mspb.gov), or the Board's e-Appeal site (https://e-appeal.mspb.gov).

## CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

Appellant

Electronic Mail      Karen Seng

Redacted
Redacted

Agency Representative

U.S. Mail      Department of Veterans Affairs
Robley Rex VA Medical Center
Human Resources Mgmt Service (05)
800 Zorn Avenue
Louisville, KY 40206

March 17, 2014
(Date)

Allison McKinley
Paralegal Specialist

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
CENTRAL REGIONAL OFFICE

| | |
|---|---|
| KAREN SENG, | DOCKET NUMBER |
|            Appellant, | CH-0752-14-0353-I-1 |
|     v. | |
| DEPARTMENT OF VETERANS | DATE: March 17, 2014 |
|     AFFAIRS, | |
|            Agency. | |

---

**THIS DOCUMENT CONTAINS IMPORTANT INFORMATION ABOUT THIS APPEAL AND ITS PROCESSING.  PLEASE READ THE ENTIRE DOCUMENT CAREFULLY.**

---

## ORDER ON JURISDICTION AND PROOF REQUIREMENTS

**There is a question whether this appeal is within the Board's jurisdiction.  As a result, the Board might dismiss the appeal for lack of jurisdiction without addressing the merits of the case.   This Order provides necessary information concerning the jurisdictional issue and the burdens of proof the appellant must meet to show that the Board should not dismiss this appeal for lack of jurisdiction, as well as how to prove the claim on the merits.**

The appeal claims the agency took retaliatory action because of the appellant's whistleblowing activity.   I **ORDER** the parties to follow the procedures set out below.  If either party has a question about any of the case processing instructions in this Order, you may call this office at the telephone number listed under my signature at the end of the Order for assistance.

## NOTICE TO THE APPELLANT

Your claim that the agency retaliated against you because of your whistleblowing activity appears to be an individual right of action (IRA) appeal. *See* 5 U.S.C. § 1221. To establish Board jurisdiction over an IRA appeal, you must show that you exhausted your administrative remedies before the Office of Special Counsel (OSC) and make non-frivolous allegations that: (1) you engaged in whistleblowing activity by making a protected disclosure; and (2) the disclosure was a contributing factor in the agency's decision to take or fail to take a personnel action.

Specifically, you must show that you brought your whistleblower complaint to the attention of OSC, and exhausted OSC's procedures. You have "exhausted" OSC's procedures once OSC has notified you that it is terminating its investigation into your whistleblowing complaint. You may also show you exhausted OSC's procedures if 120 days have passed since you filed your whistleblower claim with OSC and you have not received a termination notice. To satisfy this requirement, you must have informed OSC of the precise ground of your claim of whistleblowing and given it a sufficient basis to pursue an investigation which might lead to corrective action. The test of the sufficiency of your claim of whistleblowing to OSC is the statement you made in the complaint requesting corrective action or in other submissions to OSC, not any later characterization of those statements. It is not necessary, though, that you have correctly labeled the category of wrongdoing when you raised it to OSC.

To have made a disclosure protected under 5 U.S.C. § 2302(b)(8) means that you reported a violation of law, rule, or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, and that you reasonably believed in the truth of the matter you disclosed.

A non-frivolous allegation is a claim supported by affidavits or other evidence relevant to the matter at issue that, if proven, could establish the matters

it asserts.  Because you must make non-frivolous allegations as to each of the jurisdictional requirements set out in this Order, your claim and evidence must pertain to the proof required to support each element of those jurisdictional requirements.   Conclusory, vague, or unsupported allegations are not enough to meet this standard.  As an administrative agency, the Board has wide latitude in the kinds of evidence that it can accept, and affidavits are just one example of the kind of evidence that may be used to support an allegation.  The way in which an allegation may be supported will often depend on the particular facts of the case.

The Board has held that a "gross waste of funds" is more than a debatable expenditure, and is one that is significantly out of proportion to the benefit reasonably expected to accrue to the government; that "gross mismanagement" means a management action or inaction which creates a substantial risk of significant adverse impact upon the agency's ability to accomplish its mission; and that an "abuse of authority" occurs when a Federal official or employee arbitrarily or capriciously exercises power and adversely affects anyone's rights or causes personal gain or advantage to himself or to someone he prefers.

You need not prove that the matter you disclosed actually established any of the conditions described above, such as gross mismanagement.  You must, however, make a non-frivolous allegation that the matter you disclosed was one that a reasonable person in your position would believe was evidence of any of these situations.  The test for determining whether your belief was reasonable is this:  Could a neutral, objective person with knowledge of the essential facts that you knew or could have readily found out reasonably have concluded that the actions of the government show the condition or conditions described above? Also, you must non-frivolously allege that you disclosed the matter to someone other than the alleged wrongdoer, who may have been in a position to do something about the issue you reported, either directly through management authority, or indirectly as in disclosure to the media or Congress.  A disclosure

made in the normal course of your job responsibilities is not protected as whistleblowing.

A non-frivolous allegation that a protected disclosure was a contributing factor in the decision to take or fail to take a personnel action against you is a detailed, factual allegation that you disclosed one of the above matters, and that agency officials responsible for the personnel action were aware of your disclosure and acted within such time that a reasonable person could find that the disclosure contributed to the action. Meeting this knowledge and timing test satisfies your burden, but there are also other ways for you to satisfy it. If you do not introduce allegations and evidence to meet that test, the Board will then consider any relevant evidence on the contributing factor question, including the strength or weakness of the agency's reasons for taking the personnel action, whether the whistleblowing was personally directed at the proposing or deciding official, and whether those individuals had a desire or motive to retaliate against you. You may also show that the official accused of taking retaliatory action had imputed knowledge of your protected disclosure by showing that individuals with actual knowledge of the disclosure influenced the official's action.

In addition, you must make a non-frivolous allegation that the agency retaliated against you for making that disclosure. "Retaliated against you" means that the agency took or failed to take, or threatened to take or fail to take, a personnel action as defined by 5 U.S.C. § 2302(a)(2), such as a removal, suspension, or reassignment. A complete list of these personnel actions is set forth in the Board's regulations at 5 C.F.R. § 1209.4(a).

## PROOF OF CLAIM

If you show that the Board has jurisdiction over your appeal, you are entitled to a hearing on the merits of the appeal, at which you must prove each of those same matters by preponderant evidence, i.e., that you engaged in whistleblowing that contributed to the personnel action(s). Preponderant

evidence is the degree of relevant evidence that a reasonable person, considering the record as a whole, would need to find that a contested fact is more likely true than untrue.  5 C.F.R. § 1201.56(c)(2).  In other words, you must show that it is more likely than not that you engaged in whistleblowing that contributed to the personnel action.

If you meet this burden, then for the agency to prevail it must show by clear and convincing evidence that it would have taken the same personnel action even if you had not made a disclosure.  In order to determine whether the agency met its clear and convincing evidence burden, the Board looks at the strength of the evidence the agency used in support of the personnel action, the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision(s), and any evidence that the agency takes similar actions against employees who are not whistleblowers, but who are in other ways similar to you with respect to your Federal employment.

## REQUIRED SUBMISSIONS

For purposes of deciding whether the Board has jurisdiction over your appeal (that is, whether you made non-frivolous allegations as to each of the jurisdictional elements discussed earlier), I **ORDER** the appellant to file a statement, accompanied by evidence, listing the following: (1) your protected disclosure(s); (2) the date(s) you made the disclosure(s); (3) the individual(s) to whom you made the disclosure(s); (4) why your belief in the truth of the disclosure(s) was reasonable; (5) the action(s) the agency took or failed to take, or threatened to take or fail to take, against you because of your disclosure(s); (6) why you believe a disclosure was a contributing factor to the action(s); and (7) the date of your complaint to OSC and the date that it notified you it was terminating its investigation of your complaint, or if you have not received such notice, evidence that 120 days have passed since you filed your complaint with OSC.  Unless you submit a copy of the complaint you submitted to OSC, along

6

with any amendments you filed there, and a copy of the OSC letter notifying you of your right to appeal to the Board, your response must be in the form of an affidavit, sworn statement, or declaration under penalty of perjury, 28 U.S.C. § 1746, a form for which is found in the Board's regulations at 5 C.F.R. Part 1201, Appendix IV. The law does not require that you submit a copy of OSC's letter, but it does provide that you bear the burden of establishing the required elements of an IRA appeal.

You must file this statement within 10 calendar days of the date of this Order, and must serve a copy on the agency at the same time. The agency may file a response on the jurisdictional issue within 20 calendar days of the date of this Order. Unless I tell the parties otherwise, the record on the issue of jurisdiction will close on the date the agency's response is due. No evidence and/or argument on jurisdiction filed after that date will be accepted unless the party submitting it shows that it was not readily available before the record closed. Notwithstanding the close of the record, however, pursuant to 5 C.F.R. § 1201.58(c), a party must be allowed to respond to new evidence or argument submitted by the other party just before the close of the record. If there is no jurisdiction, I will dismiss your appeal. If the Board has jurisdiction, I will adjudicate your appeal and will schedule a hearing if you requested one.

FOR THE BOARD:

Dorothy L. Moran
Administrative Judge

## CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

<u>Appellant</u>

Electronic Mail          Karen Seng
                         Redacted
                         Redacted

<u>Agency Representative</u>

U.S. Mail                Department of Veterans Affairs
                         Robley Rex VA Medical Center
                         Human Resources Mgmt Service (05)
                         800 Zorn Avenue
                         Louisville, KY 40206

March 17, 2014                          Allison McKinley
(Date)                                  Paralegal Specialist



# MERIT SYSTEMS PROTECTION BOARD

## Appeal Form--Appellant and Agency Information

*Please type or print legibly.*

OMB No.   3124-0009

**MERIT SYSTEMS PROTECTION BOARD RECEIVED**
**MAR 14 2014**
**CENTRAL REGION CHICAGO, ILLINOIS**

1. Name (last, first, middle initial)

   Seng, Karen

2. Present Address (number and street, city, state, and zip code)

   Address:    Redacted

   City, State, Zip Code:    Redacted

3. Telephone numbers (include area code) and E-Mail Address
   You must notify the Board in writing of any change in your telephone number(s) or e-mail address while your appeal is pending.

   Home:                                    Work:
   Fax:                                     Cell:
   E-mail Address:  Redacted                Other Phone Type:

4. Do you wish to designate an individual or organization to represent you in this proceeding before the Board? (You may designate a representative at any time. However, the processing of your appeal will not normally be delayed because of any difficulty you may have in obtaining a representative.)

   ☐ Yes                                    ☑ No

5. Name, address, and telephone number of the agency that took the action or made the decisions you are appealing (include bureau or division, street address, city, State and Zip code)

   Agency Name:        Department of Veterans Affairs
   Bureau:             VETERANS HEALTH ADMINISTRATION
   Address:            800 Zorn Ave

   City, State, Zip code:   LOUISVILLE, Kentucky, 40031, United States of America
   Agency Phone:           (502) 287-4000

6. Your Federal employment status at the time of the decision or action you are appealing:

   ☐ Temporary    ☑ Permanent   ☐ Applicant
   ☐ Term         ☐ Retired     ☐ Seasonal
   ☐ None

7. Type of appointment (if applicable):

   ☐ Competitive    ☐ SES      ☑ Excepted
   ☐ Postal Service ☐ Other

8. Your occupational series, position title, grade, and duty station at the time of the decision or action you are appealing (if applicable):

   Occupational Series or Cluster:
   Position Title: Program Coordinator
   Grade or Pay Band: GS-12
   Duty Station: Louisville, Kentucky

9. Are you entitled to veteran's preference? See 5 U.S.C. 2108.

   ☐ Yes    ☑ No

10. Length of Government Service (if applicable):

    26 Years    Months

11. Were you serving a probationary, trial, or initial service period at the time of the action or decision you are appealing?

    ☐ Yes    ☑ No

Appeal Number:   201400788
Submission Date:   2/13/2014 7:48:58 PM
Confirmation Number:   182595

MSPB Form 185-1, Page 1 (6/13/201?)
5 CFR Parts 1201, 1208, and 1209



# MERIT SYSTEMS PROTECTION BOARD

## Appeal Form--Appellant and Agency Information

*Please type or print legibly.*

**HEARING:** You may have a right to a hearing before an administrative judge. If you elect not to have a hearing, the administrative judge will make a decision on the basis of the submissions of the parties. Do you want a hearing?

12. Do you want a hearing?   ☑ Yes   ☐ No

**E-Filing:** Registration as an e-filer enables you to file any or all of your pleadings with the Board in electronic form. Registration also means you consent to accept service of all pleadings filed by other registered e-filers and all documents issued by the Board in electronic form. You will receive these as PDF documents at the e-mail address you provided the Board. If registered as an e-filer, you may file any pleading, or portion of a pleading, by non-electronic means. You can withdraw your registration as an e-filer at any time.

13. Do you wish to register as an E-Filer in this appeal?

☑ I elect to E-File   ☐ I decline to E-File

14. **I certify that all of the statements made in this form and all attached forms are true, complete, and correct to ☐ the best of my knowledge and belief.**

Karen Seng, Appellant                                Date:



# MERIT SYSTEMS PROTECTION BOARD

## Appeal of Agency Personnel Action or Decision (Non-retirement)

**Complete this form and attach it to MSPB Form 185-1 if you are appealing an agency personnel action or decision (other than a decision or action affecting your retirement rights or benefits) that is appealable to the Board under a law, rule, or regulation. If the personnel See 5 CFR 1201.3(a) for a list of appealable personnel actions and action or decision is appealable to the Board, you should have received a final decision letter from the agency that informs you of your right to file an appeal with the Board.**

*Please type or print legibly.*                                                                        OMB No.  3124-0009

**Please submit only the attachments requested in this form at this time. You will be afforded the opportunity to submit detailed evidence in support of your appeal later in the proceeding.**

**Name** *(last, first, middle initial)*  Seng, Karen

Check the box that best describes the personnel action or decision taken by the agency you named in MSPB Form 185-1 that you are appealing. (If you are appealing more than one action or decision, check each box applies.)

- [x] Removal (Termination after completion of probationary or initial service period)   [ ] Involuntary Resignation
- [ ] Termination during probationary or initial service period                          [ ] Involuntary Retirement
- [ ] Reduction in grade or pay            [ ] Suspension for more than 14 days
- [ ] Separation, demotion, or furlough for more than 30 days by reduction in force (RIF)   [ ] Furlough of 30 days or less
- [ ] Denial of within-grade increase      [ ] Failure to restore/reemploy/reinstate or improper restoration/reemployment/reinstatement
- [ ] Negative suitability determination
- [x] Other action or decision (describe): Describe other action     OSC closed inquiry

| 2. Date you received the agency's final decision letter (if any) (month, day, year) (Attach a copy) | 3. Effective date (if any) of the agency action or decision (month, day, year) |
|---|---|
| 05/07/2013 | 05/14/2013 |

4. Prior to filing this appeal, did you and the agency mutually agree in writing to try to resolve the matter through an alternative dispute resolution (ADR) process?

    [ ] Yes              [x] No

5. Explain briefly why you think the agency was wrong in taking this action. In challenging such an action, you may choose to allege that the agency engaged in harmful procedural error, committed a prohibited personnel practice, or engaged in one of the other claims listed in Appendix A. Attach the agency's proposal letter, decision letter, and SF-50, if available.

    See Continuation Sheet for Response.

Appeal Number:  **201400788**                                    MSPB Form 185-2, Page 1 (5/13/2013)
Submission Date:  **2/13/2014 7:48:58 PM**              5 CFR Parts 1201, 1208, and 1209
Confirmation Number:  **182595**



# MERIT SYSTEMS PROTECTION BOARD

## Appeal of Agency Personnel Action or Decision (Non-retirement)

*Please type or print legibly.*

---

**6.** With respect to the agency personnel action or decision you are appealing, have you, or has anyone on your behalf, filed a grievance under a negotiated grievance procedure provided by a collective bargaining agreement?

☑ Yes          ☐ No

---

**7.** If your answer to question 6 is "Yes," on what date was the grievance filed (month, day, year)?

05/14/2013

Enter the place where the grievance was filed if different from your answer to question 4 in Part 1.

Agency Name:          Department of Veterans Affairs

Bureau:                    VETERANS HEALTH ADMINISTRATION

Address:                   800 Zorn Ave

City, State, Zip code:   LOUISVILLE, Kentucky, 40031, United States of America

---

**8.** If your answer to question 6 was "Yes," has a decision on the grievance been issued?

---

**9.** Did you file a whistleblowing complaint with the Office of Special Counsel (OSC)?

☑ Yes          ☐ No

If your answer to question 9 was "Yes", the date on which you filed complaint with OSC:

04/18/2013

---

**10.** Have you received written notice that the Office of Special Counsel made a decision or terminated its investigation?

☑ Yes          ☐ No

If your answer to question 10 was "Yes", the date on which OSC made a decision or terminated its investigation:

12/12/2013

---

**11.** Did you file a complaint on this matter with the Department of Labor (DOL)?

☐ Yes          ☑ No

---

**12.** Has the Department of Labor notified you that your USERRA or VEOA complaint could not be resolved?

NOT APPLICABLE

---



# Merit Systems Protection Board Form 185-2
## Appeal of Agency Personnel Action or Decision (Non-retirement)

### Continuation Sheet

5. Explain briefly why you think the agency was wrong in taking this action. In challenging such an action, you may choose to allege that the agency engaged in harmful procedural error, committed a prohibited personnel practice, or engaged in one of the other claims listed in Appendix A. Attach the agency's proposal letter, decision letter, and SF-50, if available.

I originally filled with the OSC regarding a prohibited personnel practice when I received a proposed removal. When the removal was upheld, I filed a grievance which the agency denied claiming I had filed an EEO for the same thing. This is not true as I had only inquired about an EEO and did not file a formal EEO until July 2013. The OSC finally got around to reviewing my complaint in December of 2013 and closed the inquiry stating they could not look at the proposed removal because the removal was upheld and that I had filed a grievance on the removal. In my complaint to the OSC I sited several PPP's that were occuring which included retaillation for wistleblowing and abuse of power ultimately resulting in my removal. The OCS still stated they could not address these issues without addressing the removal and they could not address the removal because I filed a grievance. When the grievance was filed and denied by the agency, the union forwarded it to the regional office for follow with the national office. The paperwork was apparently lost and has since been resubmitted. It has now been 9 months and no one has addressed the wrongful removal and the multiple prohibited personnel practices. I do have an active EEO which is adressing harrassment but also will not address the removal stating I had filed a grievance.

# e-Appeal Attachment Transmittal

**Appeal Number:**      201400788
**Appellant Name:**     Karen Seng
**Agency Name:**        Department of Veterans Affairs

Please check the box for each document included with this transmittal.

| | Name of Attachment | Attachment Processing Status | File Name/Delivery Method |
|---|---|---|---|
| ☐ | Agency Proposal Letter | Upload with e-Appeal | Seng Proposed Removal.pdf |
| ☐ | Agency Decision Letter | Upload with e-Appeal | Final Removal Letter.pdf |
| ☐ | WhistleblowerRequest, OSC Complaint | Upload with e-Appeal | Printer Friendly E-Filing Form Summary-OSC #11.htm |
| ☐ | Whistleblowing, OSC Decision or notification of termination | Upload with e-Appeal | Seng-PPP complaint denial letter.pdf |
| ☐ | SF-50, Notification of Personnel Action | Document not available or not applicable | N/A |

2 copies must be submitted of all documents submitted in hardcopy.
Send documents to be submitted in paper form to:
Washington DC Regional Office
1901 S. Bell Street, Suite 950
Arlington, Virginia 22202
United States of America

Phone: (703) 756-6250
Fax: (703) 756-7112



**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 218
Washington, D.C. 20036-4505
202-254-3600

DEC 1 2 2013

Ms. Karen Seng
Redacted
Redacted

Re: OSC File No. MA-13-2665

Dear Ms. Seng:

This letter notifies you that you may have a right to seek corrective action from the Merit Systems Protection Board (the Board). As we informed you in our closure letter, as of this date, we have ended our inquiry into your allegations.

In your complaint, you alleged reprisal for filing a grievance. Because you alleged potential violations of 5 U.S.C. §§ 2302(b)(8) or (b)(9)(A)(i), (B), (C), or (D), you may have a right to seek corrective action from the Board under the provisions of 5 U.S.C. §§ 1214(a)(3) and 1221. You may file a request for corrective action with the Board within 65 days after the date of this letter.

The Board regulations concerning the rights to file an individual right of action can be found at 5 C.F.R. part 1209. If you choose to file, submit this letter to the Board as part of your appeal. Additional information about filing an appeal with the Board is available at the Board's webpage: www.mspb.gov.

Sincerely,

Alissandra Geliga
Attorney
Complaints Examining Unit



U.S. OFFICE OF SPECIAL COUNSEL
1730 M Street, N.W., Suite 218
Washington, D.C. 20036-4505
202-254-3600

NOV 2 0 2013

Ms. Karen Seng
Redacted
Redacted

Re: OSC File No. MA-13-2665

Dear Ms. Seng:

This letter is in response to the complaint you filed with the U.S. Office of Special Counsel against the Department of Veterans Affairs. In your complaint, you allege reprisal for filing a union grievance. The Complaints Examining Unit has carefully considered the information you provided. Based on our evaluation of the facts you allege and the applicable law, we have made a preliminary determination to close our inquiry into your allegations.

The Office of Special Counsel (OSC) is authorized to investigate allegations of prohibited personnel practices and certain activities prohibited by civil service law, rule, or regulation. 5 U.S.C. §§ 1214(a)(1)(A), 1216(a) and 2302(b). Under provisions of 5 U.S.C. § 7121(g)(2), an aggrieved employee affected by a prohibited personnel practice may elect not more than one of the following remedies: (1) to exercise his/her right to pursue this matter under his/her agency's negotiated grievance procedure, if any; (2) to file a timely appeal to the Merit Systems Protection Board; or (3) to submit a complaint to the Office of Special Counsel. The Removal Letter specifically indicated that you could appeal the removal to the Merit Systems Protection Board, seek corrective action from OSC, file a grievance under the negotiated grievance procedures, or file a discrimination complaint.

Although you had previously filed with OSC concerning your proposed removal and other matters, you did not amend your complaint or otherwise inform us of your removal until after you filed a union grievance on the removal on May 13, 2013. The Removal Letter specifically stated "whichever is filed first, an appeal to the MSPB, an appeal or corrective action to OSC, a grievance under the negotiated grievance procedure, or a discrimination complaint, shall be considered an election by you to proceed under that appeal process." Because the information provided indicates that the first action filed on the removal decision was a union grievance, we have no authority to seek corrective action for the removal.

Because the other actions (proposed removal, reassignment, appointment, change in working conditions) appear to be superseded by the removal, for which we are unable to seek corrective action (we could not seek to correct those actions without addressing the removal), we have no basis to further inquiry into your allegation that those actions were the result of reprisal. Additionally, you allege that you were charged Absent Without Leave (AWOL) on several occasions as reprisal for engaging in protected activity. However, the information provided is insufficient to suggest that you were charged AWOL as reprisal for engaging in activity protected under 5 U.S.C. § 2302(b)(9).

U.S. Office of Special Counsel
Ms. Karen Seng
MA-13-2665
Page 2

Moreover, it appears that in your response to the proposed removal, you indicated that the AWOL charges resulted from the Agency's refusal to provide you a reasonable accommodation for your disability. Discrimination based on a handicapping condition is a prohibited personnel practice. 5 U.S.C. § 2302(b)(1). However, as noted in OSC's regulation at 5 C.F.R. § 1810.1, it was not intended that this office duplicate or bypass the procedures established in the agencies and the Equal Employment Opportunity Commission for resolving such allegations. It is the policy of the Special Counsel not to take action on such allegations as they are more appropriately resolved through the EEO process. In light of the information you have provided, we find no reason to depart from our policy in this matter. Thus, we will take no further action concerning your allegation of discrimination. This decision is not a judgment on the merits of your claim.

For the foregoing reasons, we have no basis for further inquiry into your complaint as possible violations of 5 U.S.C. §§ 2302(b)(1), (b)(9), or any other prohibited personnel practice over which we exercise jurisdiction. However, as previously stated, our determination to close our inquiry into your complaint is only preliminary. You have an opportunity to submit comments or additional information concerning our determination. Your response must be *in writing* and should address the reasons we cited in reaching our preliminary determination to close your complaint. You have *13 days from the date of this letter* to submit your written response. If we do not receive any written comments by the end of the thirteen-day period, we anticipate closing the file. We will then send you a letter terminating the investigation and advising you of any additional rights you may have.

Sincerely,

Alissandra Geliga
Attorney
Complaints Examining Unit



DEPARTMENT OF VETERANS AFFAIRS

Robley Rex VA Medical Center
800 Zorn Avenue
Louisville, Kentucky  40206

March 7, 2013                                          *In Reply Refer To:* 603/116

FOR OFFICIAL USE ONLY

Karen Seng
VA Medical Center (116)
800 Zorn Avenue
Louisville KY 40206

SUBJECT: Proposed Removal

1. I am proposing to remove you from employment with the Robley Rex Veterans Affairs
Medical Center based on the following reasons:

| I. | Failure to Perform Assigned Duties |
| II. | Making Inaccurate Statements in a Patient's Official Medical Record |
| III. | Failure to Follow Instructions |
| IV. | Unauthorized Absence (AWOL) |

**Specification A in Support of Charge I:** As the Community Residential Care (CRC)
Program Coordinator, it was your responsibility to ensure that each resident and sponsor
was visited at least monthly, that each resident received an annual physical examination
and that both are documented in the Veteran Patient's Veteran Affairs (VA) medical record.
Based on a review of Patient A's medical record from April 2011 through April 2012, it was
determined that you only visited Patient A three (3) times during this time period.  In
addition, the review also revealed that Patient A did not have a documented physical
examination.  You therefore failed to perform your assigned duties.

**Specification B in Support of Charge I:** As the CRC Program Coordinator, it was your
responsibility to ensure that each resident and sponsor was visited at least monthly, each
resident received an annual physical examination, and that both are documented in the
Veteran Patient's VA medical record.  Based on a review of Patient B's medical record
from January 2012 through April 2012, it was determined that you did not visit Patient B
monthly.  In addition, the review also revealed that Patient B did not have a documented
physical examination.  You therefore failed to perform your assigned duties.

**Specification C in Support of Charge I:** As the CRC Program Coordinator, it was your
responsibility to ensure that each resident and sponsor was visited at least monthly.  Based
on a review of Patient C's medical record from April 2011 through April 2012, it was
determined that you only visited Patient C six (6) times during this time period.  In addition,
the review also revealed that Patient C did not have a documented physical examination.
You therefore failed to perform your assigned duties.

~~Specification D in Support of Charge I: As the CRC Program Coordinator, it was your~~ responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient D's medical record from August 2011 through April 2012, it was determined that you only visited Patient D five (5) times during this time period. In addition, the review also revealed that Patient D did not have a documented physical examination. You therefore failed to perform your assigned duties.

Specification E in Support of Charge I: As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient E's medical record from April 2011 through April 2012, it was determined that you only visited Patient E four (4) times during this time period. In addition, the review also revealed that Patient E did not have a documented physical examination. You therefore failed to perform your assigned duties.

Specification F in Support of Charges I and II: As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly, each resident received an annual physical examination, and that both are documented in the Veteran Patient's VA medical record. It was also your responsibility to accurately chart in the patient's medical record. Based on a review of Patient F's medical record from April 2011 through April 2012, it was determined that you only visited Patient F five (5) times during this time period. In addition, the review also revealed that Patient F did not have a documented physical examination, though you charted in his VA medical record that one of our primary care providers was seeing him. You therefore failed to perform your assigned duties and made an inaccurate entry into a Veteran patient's VA medical record.

Specification G in Support of Charge I: As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient G's medical record from May 2011 through April 2012, it was determined that you only visited Patient G one time during this time period. In addition, the review also revealed that Patient G did not have a documented physical examination. You therefore failed to perform your assigned duties.

Specification H in Support of Charge I: As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient H's medical record from April 2011 through April 2012, it was determined that you only visited Patient H six (6) times during this time period. You therefore failed to perform your assigned duties.

Specification I in Support of Charge I: As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient I's medical record from April 2011 through April 2012, it was determined that you only visited Patient I four (4) times during this time period. You therefore failed to perform your assigned duties.

Specification J in Support of Charge I: As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient J's medical record from April 2011 through April 2012, it was

determined that you only visited Patient J five (5) times during this time period. You therefore failed to perform your assigned duties.

**Specification K in Support of Charge I:** As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient K's medical record from April 2011 through April 2012, it was determined that you only visited Patient K three (3) times during this time period. Furthermore, Patient K did not have a documented visit from May 2010 through February 2011. You therefore failed to perform your assigned duties.

**Specification L in Support of Charge I:** As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient L's medical record from April 2011 through April 2012, it was determined that you only visited Patient L seven (7) times during this time period. You therefore failed to perform your assigned duties.

**Specification M in Support of Charge I:** As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient M's medical record from April 2011 through April 2012, it was determined that you only visited Patient M four (4) times during this time period. You therefore failed to perform your assigned duties.

**Specification N in Support of Charge I:** As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient N's medical record from April 2011 through April 2012, it was determined that you only visited Patient N five (5) times during this time period. You therefore failed to perform your assigned duties.

**Specification O in Support of Charge I:** As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient O's medical record from April 2011 through April 2012, it was determined that you only visited Patient O six (6) times during this time period. You therefore failed to perform your assigned duties.

**Specification P in Support of Charge I:** As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient P's medical record from April 2011 through April 2012, it was determined that you only visited Patient P three (3) times during this time period. You therefore failed to perform your assigned duties.

**Specification Q in Support of Charge I:** As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient Q's medical record from April 2011 through April 2012, it was determined that you only visited Patient Q six (6) times during this time period. You therefore failed to perform your assigned duties.

**Specification R in Support of Charge I:** As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient R's medical record from April 2011 through April 2012, it was

determined that you only visited Patient R one (1) time during this time period. You therefore failed to perform your assigned duties.

**Specification S in Support of Charge I:** As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient S' medical record from April 2011 through April 2012, it was determined that you only visited Patient S five (5) times during this time period. You therefore failed to perform your assigned duties.

**Specification T in Support of Charge I:** As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient T's medical record from April 2011 through April 2012, it was determined that you only visited Patient T six (6) times during this time period. You therefore failed to perform your assigned duties.

**Specification U in Support of Charge I:** As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient U's medical record from April 2011 through April 2012, it was determined that you only visited Patient U five (5) times during this time period. You therefore failed to perform your assigned duties.

**Specification V in Support of Charge I:** As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient V's medical record from April 2011 through April 2012, it was determined that you only visited Patient V four (4) times during this time period. You therefore failed to perform your assigned duties.

**Specification W in Support of Charge I:** As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient W's medical record from April 2011 through April 2012, it was determined that you only visited Patient W six (6) times during this time period. You therefore failed to perform your assigned duties.

**Specification X in Support of Charge I:** As the CRC Program Coordinator, it was your responsibility to ensure that each resident and sponsor was visited at least monthly. Based on a review of Patient X's medical record from April 2011 through April 2012, it was determined that you only visited Patient X six (6) times during this time period. You therefore failed to perform your assigned duties.

**Specification Y in Support of Charges III and IV:** On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). However, on June 21, 2012, you did not report for duty until 9:00 a.m. You were therefore recorded as 0.50 hours absent without leave (AWOL) for this time period.

**Specification Z in Support of Charges III and IV:** On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). However, on June 26, 2012, you did not report for duty until 8:45 a.m. You were therefore recorded as 0.25 hours AWOL for this time period.

~~Specification AA in Support of Charges III and IV: On August 12, 2011, and again on~~ June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). However, on June 29, 2012, you did not report for duty until 8:45 a.m. You were therefore recorded as 0.25 hours AWOL for this time period.

Specification BB in Support of Charges III and IV: On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you follow the appropriate leave requesting procedures. On July 5, 2012, you called in and requested eight (8) hours of sick leave (SL). Because your SL balance was only five (5) hours at the time of your request and you were needed at work, your supervisor only approved 5 of the 8 hours you requested, and instructed you to report to work by 2:00 p.m., or you would be recorded as three (3) hours AWOL. You did not report to work by 2:00 p.m. as instructed. Therefore, you were recorded 3.00 hours AWOL for this time period.

Specification CC in Support of Charges III and IV: On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). However, on July 10, 2012, you did not report for duty until 8:45 a.m. You were therefore recorded as 0.25 hours AWOL for this time period.

Specification DD in Support of Charges III and IV: On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). You are also instructed to check in with a member of the Mental Health and Behavioral Sciences Service (MH&BSS) leadership team upon your arrival. However, on July 16, 2012, you did not report for duty until 9:45 a.m. and you did not report to a member of the MH&BSS leadership team upon your arrival. You therefore failed to follow instructions, and were also recorded as 1.25 hours AWOL for this time period.

Specification EE in Support of Charges III and IV: On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). However, on July 17, 2012, you did not report for duty until 9:30 a.m. You were therefore recorded as 1.00 hour AWOL for this time period.

Specification FF in Support of Charges III and IV: On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). However, on July 18, 2012, you did not report for duty until 8:45 a.m. You were therefore recorded as 0.25 hours AWOL for this time period.

Specification GG in Support of Charges III and IV: On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). However, on July 24, 2012, you did not report for duty until 8:45 a.m. You were therefore recorded as 0.25 hours AWOL for this time period.

Specification HH in Support of Charges III and IV: On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). However, on July 25, 2012, you did not report for duty until 8:45 a.m. You were therefore recorded as 0.25 hours AWOL for this time period.

Specification II in Support of Charges III and IV:  On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.).  However, on July 30, 2012, you did not report for duty until 9:00 a.m. You were therefore recorded as 0.50 hours AWOL for this time period.

Specification JJ in Support of Charges III and IV:  On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.).  However, on July 31, 2012, you did not report for duty until 9:00 a.m. You were therefore recorded as 0.50 hours AWOL for this time period.

Specification KK in Support of Charges III and IV:  On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.).  However, on August 7, 2012, you did not report for duty until 8:45 a.m. You were therefore recorded as 0.25 hours as AWOL for this time period.

Specification LL in Support of Charges III and IV:  On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.).  However, on August 10, 2012, you did not report for duty until 8:45 a.m. You were therefore recorded as 0.25 hours AWOL for this time period.

Specification MM in Support of Charges III and IV:  On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.).  However, on August 27, 2012, you did not report for duty until 9:00 a.m. You were therefore recorded as 0.50 hours AWOL for this time period.

Specification NN in Support of Charges III and IV:  On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.).  However, on August 28, 2012, you did not report for duty until 9:00 a.m. You were therefore recorded as 0.50 hours AWOL for this time period.

Specification OO in Support of Charges III and IV:  On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.).  However, on August 29, 2012, you did not report for duty until 9:00 a.m. You were therefore recorded as 0.50 hours AWOL for this time period.

Specification PP in Support of Charges III and IV:  On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.).  However, on September 10, 2012, you did not report for duty until 9:30 a.m.  You were therefore recorded as 1.00 hour AWOL for this time period.

Specification QQ in Support of Charges III and IV:  On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.).  However, on September 12, 2012, you did not report for duty until 9:00 a.m.  You were therefore recorded as 0.50 hours AWOL for this time period.

Specification RR in Support of Charges III and IV:  On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.).  However, on September 18, 2012, you did not report for duty until 8:45 a.m.  You were therefore recorded as 0.25 hours AWOL for this time period.

Specification SS in Support of Charges III and IV: On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). However, on September 19, 2012, you did not report for duty until 8:45 a.m. You were therefore recorded as 0.25 hours AWOL for this time period.

Specification TT in Support of Charges III and IV: On August 12, 2012, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). You were also instructed to check in with a member of the MH&BSS leadership team upon your arrival. However, on September 24, 2012, you did not report for duty until 9:30 a.m. and you did not check in with a member of the MH&BSS leadership team upon your arrival. You therefore failed to follow instructions, and were also recorded as 1.00 hours AWOL for this time period.

Specification UU in Support of Charges III and IV: On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). However, on September 25, 2012, you did not report for duty until 9:00 a.m. You were therefore recorded as 0.50 hours AWOL for this time period.

Specification VV in Support of Charges III and IV: On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). However, on September 26, 2012, you did not report for duty until 9:00 a.m. You were therefore recorded as 0.50 hours AWOL for this time period.

Specification WW in Support of Charges III and IV: On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). However, on September 27, 2012, you did not report for duty until 9:00 a.m. You were therefore recorded as 0.50 hours AWOL for this time period.

Specification XX in Support of Charges III and IV: On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). However, on September 28, 2012, you did not report for duty until 8:45 a.m. You were therefore recorded as 0.25 hours AWOL for this time period.

Specification YY in Support of Charges III and IV: On August 12, 2012, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). You were also instructed to check in with a member of the MH&BSS leadership team upon your arrival. However, on October 1, 2012, you did not report for duty until 9:00 a.m., nor did you check in with a member of the MH&BSS leadership team upon your arrival. You therefore failed to follow instructions, and were also recorded as 0.50 hours AWOL for this time period.

Specification ZZ in Support of Charges III and IV: On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). However, on October 4, 2012, you did not report for duty until 9:30 a.m. You were therefore recorded as 1.00 hours AWOL for this time period.

Specification AAA in Support of Charges III and IV: On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of

~~duty (8:30 a.m.). However, on October 9, 2012, you did not report for duty until 9:00 a.m. You were therefore recorded as 0.50 hours AWOL for this time period.~~

**Specification BBB in Support of Charges III and IV:** On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). However, on October 10, 2012, you did not report for duty until 9:00 a.m. You were therefore recorded as 0.50 hours AWOL for this time period.

**Specification CCC in Support of Charges III and IV:** On August 12, 2011, and again on June 13, 2012, you were instructed to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). However, on October 11, 2012, you did not report for duty until 8:45 a.m. You were therefore recorded as 0.25 hours AWOL for this time period.

**Specification DDD in Support of Charges III and IV:** On October 11, 2012, you were instructed a third time to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). However, on October 15, 2012, you did not report for duty until 8:45 a.m. You were therefore recorded as 0.25 hours AWOL for this time period.

**Specification EEE in Support of Charges III and IV:** On October 11, 2012, you were instructed a third time to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). However, on October 16, 2012, you did not report for duty until 8:45 a.m. You were therefore recorded as 0.25 hours AWOL for this time period.

**Specification FFF in Support of Charges III and IV:** On October 11, 2012, you were instructed a third time to ensure you arrive at work at the start of your tour of duty (8:30 a.m.). However, on October 18, 2012, you did not report for duty until 8:45 a.m. You were therefore recorded as 0.25 hours AWOL for this time period.

2.  I find your behavior egregious due not only to its negative impact on our Veteran patients, but also to its frequently repeated nature.  Regarding the Veteran patients in the CRC program, several months passed without you visiting multiple veteran patients, though it was your responsibility as CRC Program Coordinator to ensure these visits took place. Additionally, the fact that you made inaccurate statements in a Veteran patient's medical record, have habitually not reported for work on time, including some instances of tardiness without being recorded as AWOL, and continually fail to follow instructions given to you gravely concerns me.  Your actions are completely unacceptable and cannot be tolerated.

3.  You have the right to reply to this notice orally, or in writing, or both orally and in writing, and to submit affidavits in support of your reply, showing why this notice is inaccurate and any other reasons why your removal should not be affected.  The evidence on which this notice of proposed action is based will be available for your review by contacting Winthrop Payne, Employee/Labor Relations Specialist, in Human Resources Management Service, Building 3, or by calling him at (502) 287-5626.  You will be allowed official duty time to review the evidence relied on to support the reasons in this notice, to prepare a written reply, to secure affidavits, and to make a personal reply.  Arrangements for the use of official time or requests for additional time should be arranged through me.  You have the right to representation by an AFGE representative, an attorney or other representative of your choosing at all stages of the case, and your designation of a representative other than AFGE must be in writing.  The

~~representative may be disallowed if the individual's activities as a representative would cause a conflict of interest or position.~~

4. You will be given 14 calendar days from your receipt of this notice to reply to these reasons orally or in writing, or both orally and in writing. Your written reply should be submitted to the Medical Center Director, Mr. Wayne L. Pfeffer, who will also receive your oral reply.

5. The final decision to effect the action proposed has not been made. Mr. Pfeffer will make the final decision and will give full and impartial consideration to any replies, if submitted. You will be informed in writing of the final decision as soon as possible after your reply has been considered or, if you do not reply, as soon as possible after the 14-day notice period expires.

6. If it is the decision of Mr. Pfeffer that you be removed, your removal will be effected not less than 30 calendar days from the day after the date of receipt of this notice.

7. You will be retained in an active duty status during the advance notice period.

8. If you do not understand the above reasons why your removal is proposed, or have any questions regarding the procedures for this action, you may contact me, AFGE Local 1133, or Winthrop E. Payne, Employee/Labor Relations Specialist, in Human Resources Management Service, Building 3, or by calling him at (502) 287-5626.

*Connie N. Paynter, LCSW, BCD*
Connie N. Paynter, LCSW, BCD
Chief, Mental Health and Behavioral Sciences Service

I have received the original and one copy of this proposed removal notification letter, dated March 7, 2013:

Karen Seng                          Date   3/7/13

FOR OFFICIAL USE ONLY



## DEPARTMENT OF VETERANS AFFAIRS

**VA Medical Center
800 Zorn Avenue
Louisville, Kentucky 40206**

FOR OFFICIAL USE ONLY                    In Reply Refer To:  603/05

May 7, 2013

Karen Seng, LCSW
VA Medical Center (116)
800 Zorn Avenue
Louisville, KY 40206

SUBJ:  Removal

1. In connection with the letter of March 7, 2013, in which you were given advance notice of your proposed removal, I have decided to remove you from employment, effective May 14, 2013, based on the following reasons:

**Reason I – Failure to Perform Assigned Duties; Reason II – Making Inaccurate Statements in a Patient's Official Medical Record; Reason III – Failure to Follow Instructions; and Reason IV – Unauthorized Absence (AWOL), as stated in the proposed removal notice, are sustained.**

2.  In reaching this decision, your written reply, dated March 27, 2013, your oral reply of April 5, 2013, along with the subsequent information provided to me on May 1, 2013 regarding the additional evidence submitted to your AFGE representative on April 24, 2013, were carefully considered along with all the evidence developed.

3.  I also considered other factors, including your years of service, your past work record, the seriousness of the offenses, and whether there are any mitigating or extenuating circumstances which would justify mitigation of the proposed penalty.  I determined that there were several overriding aggravating factors; including the frequency of the AWOL charges, the clarity with which you were on notice of reporting to duty as scheduled, your apparent inability to conform to Department of Veteran Affairs (DVA) standards of conduct, along with the fact your actions jeopardized the health and welfare of Veteran patients.  I have, therefore, concluded that the sustained charges against you are of such gravity that the penalty of removal is appropriate and within the range of reasonableness.

4.   You are entitled to:

   a)  appeal this action to the Merit Systems Protection Board (MSPB) or

   b)  seek corrective action before the U.S. Office of Special Counsel (OSC) or

   c)  file a grievance under the negotiated grievance procedure or

d) file a discrimination complaint with the Office of Resolution Management (ORM).

5. If you appeal to the Merit Systems Protection Board (MSPB), your appeal may be submitted by mail, facsimile, by commercial overnight delivery, by electronic filing at https://e-appeal.mspb.gov/, or in person at any time after you receive this letter, but not later than 30 calendar days after the separation has been effected, or 30 calendar days after the date of your receipt of this decision, whichever is later. The address to mail your appeal is 230 Dearborn Street, 31st Floor, Chicago, IL, 60604-1669. You must submit an original and one copy of both your appeal and all attachments. If you do not submit an appeal within the time set by statute, regulation, or order of a judge, it will be dismissed as untimely filed unless a good reason for the delay is shown. The judge will provide you an opportunity to show why the appeal should not be dismissed as untimely. Copies of the Instructions for the Merit Systems Protection Board Appeal Form (Form 185) are attached. Please refer to www.mspb.gov for information regarding the appeals process and procedures that must be followed. An attorney or other representative of your choice may represent you. If you decide to file an appeal with MSPB, you should notify the Board that the agency's point of contact for this appeal is:

Winthrop E. Payne, MPH
Human Resources Specialist
Department of Veterans Affairs
Robley Rex VA Medical Center
800 Zorn Avenue
Louisville, Kentucky 40206
(502) 287-5626
winthrop.payne2@va.gov

6. If you elect to seek corrective action by the Office of Special Counsel's (OSC) Complaints Examining Unit (www.osc.gov/oscefile), your appeal will be limited to a determination as to whether the agency took one or more covered personnel actions against you in retaliation for making one or more protected whistle blowing disclosures, which constitutes a prohibited personnel practice in accordance with 5 USC 2302(b). If OSC dismisses your claim, you may file an individual right of action (IRA) appeal to MSPB but MSPB will only adjudicate whether you proved that your protected disclosure was a contributing factor in the effected adverse action.

7. If you elect to file a grievance through the negotiated grievance procedures, your written grievance must be submitted within thirty (30) calendar days of the date you receive this letter, in accordance with the provisions of the labor agreement between the Department of Veterans Affairs and American Federation of Government Employees (AFGE). If you elect to file a grievance under the negotiated grievance procedure, you will be entitled to union representation as provided for in the negotiated agreement.

8. If you believe this action is based on discrimination on the basis of race, color, religion, sex, national origin, age or handicap, you may file a complaint of discrimination or raise the issue of discrimination in any appeal to MSPB, or in a grievance under the negotiated grievance procedure as described above, when the negotiated grievance procedure allows a complaint of discrimination to be raised in connection with a grievance. If you do not raise the issue of discrimination in the negotiated grievance procedures and subsequently request that MSPB review the arbitration's decision regarding your grievance, MSPB will not allow the issue of discrimination to be raised. If you elect to file a complaint of discrimination, you may do so by contacting the Office of Resolution Management (ORM) at 1-888-737-3361. Your complaint will

be processed in accordance with the Equal Employment Opportunity Commission EEOC regulations at 29 C.F.R., Part 1614.  Your initial contact with the ORM office must be done within 45 calendar days of the effective date of this action.

9.  Whichever is filed first, an appeal to the MSPB, an appeal for corrective action to OSC, a grievance under the negotiated grievance procedure, **or** a discrimination complaint, shall be considered an election by you to proceed under that appeal process.

10. For further information and/or a further explanation of your appeal rights, you may consult Winthrop E. Payne, Employee/Labor Relations Specialist, Human Resources Management Service, at (502) 287-5626, located in Building 3.

Wayne L. Pfeffer, MHSA, FACHE
Director, Robley Rex DVA Medical Center, Louisville

I have received two (2) copies of this removal notification letter, dated May 7, 2013:

_____
Signature

_5/7/13_
Date

E-Filing form printed on 6/10/2013 4:24 PM

**Form11 5/30/2012**
Status            Processed
**Original Entry Date** 5/30/2012 12:52 AM
**Last Modified**    4/18/2013 3:44 PM
**Case Number**     MA-13-2665

**User Information**
karen seng
Redacted
Agency: Veterans Affairs

**A summary of the data you entered:**

**Did the incident occur while federally employed?**
Yes

**Were you employed by any of the following Federal agencies?**
a Federal agency not listed above

**Your name: prefix**
Ms.

**Your name: First name**
karen

**Your name: Middle name**
r

**Your name: Last name**
seng

**Your name: Suffix**

**Your home address: Street**
Redacted

**Your home address: Apt No**

**Your home address: City**
Redacted

**Your home address: State**
Redacted

**Your home address: Zipcode**
Redacted

**Your home address: country**
UNITED STATES

**Your phone numbers: International Number**
False

**Your phone numbers: Country Code**
00000

**Your phone numbers: Home**

**Your phone numbers: Home Ext**

**Your phone numbers: Work**

**Your phone numbers: Work Ext**

**Your phone numbers: Cell**
Redacted

**Your phone numbers: Cell Ext**

**Your phone numbers: Fax**

**Your phone numbers: Fax Ext**

**Your phone numbers: Other**

**Your phone numbers: Other Ext**

**Your phone numbers: Email**
Redacted

**Outreach Info: How did you first become aware that you could file a complaint with OSC?**
OSC Web Site

**Outreach Info: How did you first become aware that you could file a complaint with OSC?**
OSC Poster

**Outreach Info: How did you first become aware that you could file a complaint with OSC?**
Union

**Outreach Info: For Other, please describe:**

**Outreach Info: Date (approximate):**
5/7/2012

**Do You Have a Representative?**
No

**Agency Address: Agency Name**
Veterans Affairs

**Agency Address: Street**
800 zorn ave

**Agency Address: Apt No**

**Agency Address: City**
louisville

**Agency Address: State**
Kentucky

**Agency Address: Zipcode**
40206

**Agency Address: Country**
UNITED STATES

**Job Info: Title**
social worker-program coordinator

**Job Info: Series**
GS-0185

**Job Info: Grade**
GS-12

**Are you covered by a collective bargaining agreement (or union contract)?**
Yes

**Enter Your Employment Status: Applicant for federal employment (not current employee)**
False

Enter Your Employment Status: Excepted Service (For Other, please specify)
not sure why I"m listed as excepted

Enter Your Employment Status: Other (For Other, please specify)

Actions Taken: Filed appeal with Merit Systems Protection Board (MSPB)

Actions Taken: Filed petition for reconsideration of initial MSPB decision

Actions Taken: Initial MSPB decision No.

Actions Taken: Filed USERRA claim with VETS in Department of Labor

Actions Taken: Filed grievance under agency grievance procedure

Actions Taken: Filed grievance under negotiated grievance procedure
4/12/2012

Actions Taken: Matter heard by arbitrator under grievance procedure

Actions Taken: Matter is pending in arbitration

Actions Taken: Filed discrimination complaint with agency

Actions Taken: Appealed discrimination complaint decision to Equal Employment
Opportunity Commission

Actions Taken: Filed appeal with Office of Personnel Management (OPM)

Actions Taken: Filed unfair labor practice (ULP) complaint with Federal Labor Relations
Authority (FLRA)

Actions Taken: Filed lawsuit in federal court

Actions Taken: Court name

Actions Taken: Reported matter to agency Inspector General

Actions Taken: Reported matter to one or more members of Congress

Actions Taken: Names of senators or representatives

Actions Taken: Other (specify)
3/18/2013

**Actions Taken: For Other, please specify**
Filed EEO

**Actions Taken: None**
False

**Non EEO Reprisal More Details: What specific information do you have to support your belief that the agency took or failed to take the action(s) about which you complain because of the victim's appeal, complaint, or grievance?**
The Supervisor Gaila Taylor was the subject of my grievance. The chief had previously viewed me in a positive manor and saw me as a contributing member of the staff and had called upon me to help with projects, policy etc. That all changed after this supervisor position was created and Ms. Taylor was put in that job.

I have documentation and examples of more than 4 years of harassment, bullying, intimidation and deformation of character/slander and lies told by Ms. Taylor. I filed the grievance against Ms. Taylor, sighting one of multiple e-mails where Ms. Taylor had instructed me to act counter to the program Handbook and Federal law and claimed untrue compliance issues with my program. It was after receiving the emails with false claims that I felt backed into a corner and I couldn't deny any longer what was happening to me or make excuses for the supervisor or work harder to please her because nothing was going to change. We had been equals until she was put in this position and given the power to manipulate and control people. My entire life had been affected and I couldn't take anymore of the hostile treatment, the lies she had told and the fact that she had completely ignored and denied the issues I brought to her attention regarding the case manager and complaints from caregivers. I kept trying to trust her as my supervisor and bring things to her attention only to have her turn it around on me every time. I became more and more fearful of meeting with her and what untruths would be said. The course of harassment spanned the entire time she has been my supervisor.

I was treated differently from the other program coordinators. I was the only one never asked to cover as supervisor in her absence. I have multiple email examples. I am the only one not given respect as a coordinator or flexibility in the position (as I previously had). The only one she did not support when things came up or even give me the opportunity to discuss or explain. I am the only one she gave no positive feedback and even turned positive feedback from others into negatives. She intentionally kept me in the dark about happenings and would go around me and fish for things she could turn into problems. She said no to any request I would make or suggestion I would have. She would not approve me to attend any clinical training. She used the case manager, (who was mad at me for bringing issues to management's attention after she became hostile with me and threw things in my office and yelled at me and refused to do assignments), to strategically work with her to try and cause me to trip up or mess up. I could see what they were doing and communicated with the union about it. I was also advised by other staff that the case manager would be on the phone with my supervisor repeatedly. The program support assistant and the peer support specialist are witness to how I was treated and the hostility of this case manager as well as her behavior. The peer specialist was never ask to participate in any discussions or share any information with management as they knew he was aware and would support the truth of what was happening and of what I had been telling them. He was

intentionally left out of any questioning.

Not long after I filed the grievence, I was pulled from my position. First temporarily and then after the 2nd step of the grievance with the chief of the service, I was permanently removed.

When Ms. Taylor stated that HR sent her a message instructing her to take my computer and cell phone. She said Chris Rowzee (HR) sent her an e-mail about 6 pm which she stated she saw when she arrived to work. When I inquired as to why, and she stated she is just doing what she was told. I handed Ms. Taylor my computer and proceeded to get my messages off of my phone before handing it over and she stated to me "I need the phone now." I motioned just one second as I was almost finished and she loudly and firmly said "I NEED IT NOW" as she had her hand out and practically taking it from me with a very hostile and abusive tone. I was given no explanation as to why any of this was happening. The manor at which she retrieved the computer and phone was unprofessional, humiliating, demeaning and unnecessary. I was being treated like a criminal and had done nothing wrong. I contacted the union and advised that my computer and phone had been taken and that I had to sign for those through the IT department and was responsible for them. They spoke to HR who seemed to find humor in it and instructed Ms. Taylor to write a statement that she had the computer and phone and was assuming responsibility. I DO NOT BELIEVE Ms. Taylor RECEIVED A MESSAGE FROM HR, BUT RATHER DID THIS ON HER OWN, AND THEN CONTACTED HR WHO BACKED HER. I ASKED THE UNION TO REQUEST THE MESSAGE BE FORWARDED AND THEY TOOK HR'S WORD FOR IT. CHRIS ROWSEE (HR) IS THE SAME PERSON WHO DIDN'T FEEL MS. TAYLOR WAS INAPPROPRIATE IN HER MESSAGE CLAIMING I HAD VIOLATED HIPPA, (a year or so previous-see documentation) WHEN THE PRIVACY OFFICER I HAD ALREADY SPOKEN TO ABOUT IT CLEARLY SAID her CLAIM OF A VIOLATAION WAS INAPPROPRIATE. I BELIEVE THEY MAY BE FRIENDS AND HAVE SOME KIND OF CONNECTION. I later understood that the IT department was very upset with how they handled taking the computer from me.

Ms. Taylor repeatedly refused to support me in my role as the coordinator. I brought to her attention complaints I had received about the case manager from the care givers and discussed with her my plan to address the problem, through an assignment change. She stated she was in agreement with my plan. Once I implemented the assignment change, Ms. Taylor denied that I spoke with her about it and directed me through an e-mail not to make any changes without discussing with her first. I was not allowed to solve the problem and therefore lost credibility with the caregivers who had made the complaint, having been re-assured that as the coordinator it was my responsibility to assign the work of the staff (which it was suposed to be) and I would make the change to resolve the issue. I was prevented from doing that.

I was doing the right thing and so to cover for the case manager or cover up something, I became the scape goat. They protected this case worker and rather than address the hostile working environment and protect me and the other staff and support me as the coordinator, they minimized her behavior and in fact took advantage of the fact that she was mad at me, to have her sit in our meetings and take notes word for word. Then I would randomly get a call from Ms. Taylor questioning something I had said in the meeting, that she would have no knowledge of, if not for the case manager's report. Ms. Taylor later denied that she had meetings with the case

manager and stated it was the chief, Ms. Paynter who had met with her often.

Ms. Taylor had stated to me she would arrange a meeting with the case manager's supervisor, Mr. Whittaker, and failed to follow through. We also had agreed that I would contact him about the situation. However, when I attempted to meet with Mr. Whittaker, he stated to me he was told, by Ms. Taylor, not to talk to me. (A message I have in writing) He has since left his job.

The attitudes and behaviors of the case manager, whom I had discussed with Ms. Taylor, continuously created a hostile work environment. Other program staff reported the same to their supervisors and I reported to Ms. Taylor, instances of her throwing papers in my office, yelling at me and stating to me that there was something wrong with me because I don't "think like everyone else," that Ms. Taylor refused to address. Because I had disclosed my disability when requesting a reasonable accommodation for a 30 min. change in tour, this case worker began treating me like a second class citizen and making comments as stated above. She would raise her voice if she disagreed with something I said and often refused to perform her job as requested. She was disrespectful to me in the presence of others including the caregiver sponsors in the program whom we provided training for twice a year. (One sponsor made the comment in her documented evaluation about the disrespect shown to me.) Nothing was ever done to address this issue and support me but instead this person was supported in her inappropriate behavior and has been returned to her job in the program while I was completely taken out of my job. The person, who created the problems and spoke the loudest and stomped off to do whatever she pleased, has been rewarded and returned to the program. I have been informed by other staff who work in the same clinic that she has stated I'm "crazy" and it was "all her fault," referring to me.

Ms. Taylor used this case manager and a couple of specific cases to create the appearance of a problem with one of our homes and accused the sponsor of wrong doing. I did not agree with what was transpiring and discussed the situation in detail with the National Program director in Central Office. Ms. Taylor refused to even allow me to share my perspective. She accepted the opinion of the case worker and when I confronted her about not giving me the opportunity as the Coordinator to offer a different perspective, again she said it came from higher than her and she was just doing what she was instructed. She accepted the word of this case worker who was not her supervisee. She was supposed to be my supervisor and would not even allow me the opportunity to discuss the case or my perspective with her. In fact, she made decisions about the case in my absence and then had the secretary call me at home to tell me it "would be ok" for me to stay home another day and deal with my situation. This was completely out of character for her to offer any kind of understanding or nice gesture after the multiple AWOL's she punitively issued and continues to issue. When I didn't accept the invitation to stay home another day and came to work, the case manager stated that she "thought I wasn't going to be there." How would she have known anything related to me staying home if she was not aware of the plan to have me stay home? The case worker ran back to Ms. Taylor who gave her instructions under the auspice of it came from higher than her. My authority as the Coordinator of the program was completely undermined and she began to dictate orders that were not consistent with the program mission or law. I was accused of not following the chain of command when I had functioned independently for 3+ years before she became the supervisor and suddenly now I wasn't following chain of command.

An Example of this same kind of accusation of not following the chain of command occurred the

previous year related to a TBI patient referral and acceptance for a national pilot program. Other SW supervisory staff had relayed that I should have received an award for assisting this veteran and his family and advocating for his inclusion above and beyond and his subsequent acceptance in the pilot program. A good thing was falsely turned into something bad and I, as well as the program, was prevented from having any participation in this veterans care.) This made no sense and was completely counter to the National message and TBI initiatives. It was made a chain of command issue I believe because I included the National Director in the CC part of my message to our leadership, just to let him know we had a veteran accepted. The pilot was new and something we had addressed at our last conference. The National Director, Dr. Edes was interested in learning if any of our programs would be involved with the pilot. There were only 5 in the country accepted at the time so it was exciting to be one of them. Not long after I sent the message, I was tricked by Ms. Taylor to provide information to the chief of staff in a meeting about the pilot (told to me as if it were going to be a positive meeting) Instead, I was trapped in a meeting with the chief of staff, the chief of my service, the AA for the department and my supervisor who proceeded to sit proudly as the chief of staff yelled at me and accused me of "not going through the chain of command." I simply made a referral which is what social workers do. There was no chain of command issue. The only thing I can think of is that my supervisor saw this as an opportunity to make me appear defiant or something because she was on vacation when I shared the information at our mental health social work meeting and she must have read it in the minutes. Not long after that, the chief sent a message out stating people could not talk to Central Office without going through their supervisor. As a member of the National Advisory Board, I was in communication with CO leadership on a regular basis and I feel they were trying to find a way to control all those communications as well.

Ms. Taylor falsely accused me of things such as a HIPPA violation (see documentation in the time line document) and stated she had received "complaints" which she could not produce and would not disclose who complained using this as the basis for the worst evaluation I have received in 25 years. (Following 3 years of exceptional evaluations by my former supervisor). (See letter of disagreement with evaluation)

There are multiple other examples. One of the other porogram coordinators who has been here almost as long as me and a very competent, smart and creative individual was also given an evaluation far below what it should have been. She left her position voluntarily because she saw what Ms. Taylor was trying to do and chose to get another job and get away from her as a manager.

Every time I tried to take action as the coordinator to fix a problem, I was told I couldn't talk to anyone in another service without going through Ms. Taylor first.(I had worked on an Emergency Room SOP with the Emergency Room chief nurse and told by Ms Taylor I was not to follow up with her or anyone without going through her first – Then the next day she sends me and email "directing" me to provide her the name of who I spoke with. This comes after I reported positive results from my meeting with her and near resolution of the problem.

Time after time I was treated like I was not capable of performing coordinator functions, and all designed to sabotage me because I would handle things then be prevented from following through which made me look like I didn't follow through. Or I would be recognized outside of the supervisor's domain and then she would find fault in some other area (to make sure I received no credit or kudos for anything I was doing). The emails accusing me of not following

policy and acting like I didn't follow her "orders" which is how she stated things. Or her"directive." Very hostile and un-necessary and not true.

A direct violation of the CRC Program Handbook and National GEC policy occurred when Ms. Taylor pulled the SW case manager from the program a year and ½ previous and told me I was to do her job too and told the other case worker that "her job would not change, just mine." I repeatedly told Ms. Taylor I was doing the best I could and I was not able to keep up with both jobs. I expressed that I was concerned about neither job being done properly, effectively or thoroughly. She would tell me to do the best I could and she would keep trying to get the position filled.

Ms. Taylor knew all along things were behind and the day before I'm contacted by the risk manager stating she was asked to do a program review, she sends me an email falsly accusing me and the program of having "major compliance concerns." I would not be surprised if Ms. Taylor or Ms. Paynter didn't request the review herself after setting me up, to make it look like I wasn't doing my job when they found the things behind as I had never denied and was telling her all along was impossible to maintain without filing the vacant position. Just a week or so before I was removed, Ms. Taylor met with my team and told us that the position for the case manager had finally been approved. We were going to get the case manager position filled that I had been trying to maintain as best I could for almost 2 years. This validates that I was in fact expected to do two jobs and I should not be punished when obviously I couldn't keep up. In fact, I welcomed the risk manager review and told her in an email that I was behind because of having to cover the two jobs for an extended period of time and that I hoped her review would help us get the position filled.

To add to this hostile treatment, I was constantly being harassed about being late and charged AWOL even when I called as required. In fact, I 'm thinking that they are approving my SL and CB as nothing was being said to me any differently, and I later find that they approved none of it and charged me AWOL and posted me WP. The person in the office that we report to said to me that he was told to send me to a manager if I called. I ask if this was a change in our procedure that everyone now had to do and he said "no, just you." In other words, treat me differently from everyone else. I had requested accommodation for my disability for a 30 min. window of flexibility in the morning or to change my tour by 30 min. They repeatedly refused and have denied both accommodation requests I have submitted stating they don't have enough information to establish that I am an individual with a disability and that it doesn't meet the agency needs. There is no conflict for the agency what so ever as others have different tours and I have turned in Dr. Statements to this affect. I have demonstrated that the problem would be resolved with this accommodation and have appealed to the supervisor for help in this area and support but they would rather deny me an accommodation so they can continue to harass me and document AWOL's to use as justification to remove me. I am a good employee and this is my greatest weakness and has been for my entire life. I deliberately have been set up to fail in this area. They know it's a weakness and rather than have a solution, they keep the problem fresh and shame me each and every day by having me "check in" every morning. They have nothing else to fault me for so they capitalized on my difficulty to flaunt their power and control. I am the only professional staff person that has ever had to succumb to this kind of treatment. They also are completely aware, by being in the field of mental health, that this is a common weakness and

diagnostically significant for my disability and have targeted it. The mental health department and the VA on a National level, is supposed to be about the recovery model of care and helping people move forward despite their disabilities and yet they don't practice what they preach in the treatment of their own staff. After I disclosed my disability, the treatment by management only got worse. The stigma and unfair treatment became obvious to me as well as to others. The last case manager randomly asks me one day what Ms. Taylor had against me. A number of other people have also asked me why she picked on me or why she didn't like me. Or what did I do to "get on her bad side?" Management has used knowledge about my disability and their position of power to intimidate me and make me fearful. I was clearly targeted and it had become psychologically and emotionally unsafe. Other staff has been intimidated by watching how I have been treated and fear it happening to them. The friendly supportive atmosphere has disappeared and is now fear based. My symptoms increased from the harassment and bullying. I developed increased anxiety and near panic when I would be running a few minutes behind. My physician added an additional medication to help me cope with the increased stress. I didn't trust meetings with Ms. Taylor any longer because repeatedly she would act supportive in the meeting and then turn it around and lie and not support me. Not once did I receive the support given to the other coordinators nor the validation as a coordinator. There are plenty of people if asked who would confirm that I have been treated differently.

We were moved to offices another 20 miles out making my one way commute almost 50 miles. My supervisor knew I was going through a divorce and that I was struggling financially. The added miles increased the cost of just getting to work. My kids were having problems too and it seemed Ms. Taylor made things more difficult for me when she knew I was dealing with difficult issues at home. It was like she was trying to make me fail. The approaches she used were stigmatizing and brought attention to my shortcomings. Others were asked to report when I arrived to work and I had to call her from my office phone as soon as I got in every day. The others in the office were keenly aware of all this. Ms. Taylor put me in a vulnerable position and stripped me of credibility and respect of my peers for something I couldn't help. I felt shamed and humiliated. Charging me leave without pay repeatedly, created even more of a hardship and has resulted in a negative financial spiral down. The impact of this harassment and bullying on my mental health and life overall has been significant. Managements refusal to allow me a small window of flexibility (which would have completely changed all the dynamics in how I was viewed by others and eliminated all the stress and anxiety with no impact on the program), instead targeting my weakness was intended to make me fail.

I confronted her with my perception of her actions and never received an acknowledgement or response and the punitive treatment and targeted harassment continues to this day. I later saw that my message to her was forwarded to HR stating I was hostile. Everyone who knows me would tell you that is as far from the truth as it could be. My downfall is being too nice and not speaking up for myself. I've never been a trouble maker and always a hard worker and team player. This experience with this supervisor has been completely unique to me and forced me to

I am the only staff member required to report to management upon my arrival to work and the only one not allowed to call in to the call in line but have to be specifically transferred to a manager. I was issued several letters of instruction about my tardiness as their way of covering up their discriminatory actions toward me and then strategically and routinely refused to grant

any use of leave documenting my arrival time each day and charging me AWOL. This was intentionally used to justify their targeted actions toward me. I re-applied for my job which I should never have been removed from in the first place and not selected. No one had more experience or was more qualified than me for the job. I had put the program together from scratch. Developed it from the ground up in 2005/06. The staff member selected (AAF under age 40) was hired and trained by me before Ms. Taylor was put in the supervisory position. This young lady was able to get a promotion because of the supervision, training and mentoring I gave her. I have the email she sent thanking me for the good training, which gave her the experience for her promotion giving her the ability to apply for this one.

These actions taken against me by the Chief of the service, Ms Paynter and my supervisor, Ms Taylor are clearly abuse of power, retaliatory, discriminatory and hostile. I remain isolated in an office with several others, adding to the difficulties I have with distractions and concentration (also a component of my disability) with no real purpose other than reviewing and logging data that I could easily do from home or another location and free up the space needed for medical center staff. Although I maintain the title of "coordinator," I do not coordinate anything nor have I been included in the coordinator meetings or treated like the other coordinators. In fact, my name was removed from the coordinators email group.
The title of coordinator was only given to me so that they could say that removing me from my position did not harm me in any way. I am required to check in with my supervisor or a manager every morning as I am on display for everyone to see. I always called when I was going to be late after the flexibility I had in the beginning disappeared with the re-organization of the department and the addition of the supervisor. I worked over most evenings and never complained or ever ask for comp time. I have always been a dedicated employee and have worked hard my whole career. As a positive person, I never dreamed or really believed that people would intentionally set out to destroy someone until it happened to me. Someone in power who has an arterial motive can turn a good reputation and a valued employee into the appearance of a problem employee by targeting vulnerabilities and using these strategic strategies over time to destroy someone.

Although I was never told anything, other staff had been told that I was removed because of violations and problems with the program. There were no direct intentional violations by me but yes, there were problems created by management in not filling the vacant position and my not being able to maintain both positions for an extended period of time and directing me to manage the program outside of the regulations which I would not do. Ms. Taylor was fully aware of the difficulties and did nothing to help. In fact, she strategically used the case manager to try and trip me up to make a mistake and to occupy my time with her needs preventing me from making all the visits and being able to attend to that additional work. The risk manager who reviewed the program told the union president that "she did not see that many problems with the program" yet the letter I received from (written by Chris Rowzee) HR when the union requested the report states it was recommended by the risk manager that the coordinator be removed. A formal written report made by the risk manager was never produced (likely because there wasn't one and likely because it was not a "formal review") and nothing other than the statement made by HR would lead to that conclusion. These two statements as well as the correspondence I had with the risk manager are in opposition to each other. And if that was the case, why were the other recommendations listed, not acted upon? The things the risk manager was asked to review were

not even appropriate nor part of the program responsibility. I was never consulted or included in any of the discussion about the program or asked to clarify anything or speak to anything that was program related. I was intentionally left out so that when something occurred that could be viewed as negative (when seen in isolation of any other facts or information), it could be looked at as "problems with the program" and/or "problems with the management of the program" and made out to be my fault. Everything was filtered through the supervisor who obviously had targeted me.

For example; information I had pulled together for her, to demonstrate the cost savings the program was having on the medical center and to help her show the value of the program to be able to justify replacement of the case manager, that she told me she submitted to the chief of staff was NEVER submitted. (Verified by the chief of staff when I ask her directly during my grievance meeting)which can be verified by the union representative who was present. John Hetzel.

When I expressed to the chief of staff that I felt set up to fail by not filling the case manager position and that I had advised the supervisor multiple times there was no way to keep up with both jobs and I wasn't able to make all of the visits every month, she ask me if I had that in writing. Most supervisor communications were verbal although I did inform her that there were a few emails where it was in fact referenced. The HR representative later suggested to the union rep that I write a letter to Dr. Rothschild stating I had discussed the above with my supervisor. (See letter to the chief of staff)
I also told her that I welcomed the risk manager review hoping it would help us get the position filled which I communicated to the risk manager. I was extremely bothered by not being able to run the program as I had previously and looked forward to when I could get everything back on track as it had been before they put two jobs on me. When I expressed that this felt like retaliation for having filed a grievance she rolled her eyes at me and said in a condescending voice, "OH PL-E-ASE!"

This program, the templates and procedures I developed have been modeled across the country and I was viewed as an expert at the National level yet treated at my own station like I was incompetent and a criminal. Almost all of the templates and all of my hard work have been deleted here. I was blocked from the Program folder where I kept inspection documents and logs of incidents and other important data. I had a log of facility visits by the case manager which has been removed from the folder. (Discovered before I was taken out of the system- and of which I have a partial paper copy. Also can be verified by the former program support assistant, Kim Ismaili) The log had been started when one of the facility caregivers stated that Ms. Turner would be seen driving by the facility and never stopping to make a visit. I was never asked to instruct anyone on anything related to the program or to show anyone where files were located or what the status of a veteran's case was, etc. I was not allowed to complete my case documentation therefore creating more of an appearance of visits not made. I was not allowed to inform the veteran patients or the caregivers of my leaving and bring closure to the relationships. That is completely un-professional and is counter to our professional code of ethics. I was prevented from entering my office for over a month and when I was finally allowed to gather my personal things, I was directed not to show up earlier than the designated time (my key was taken earlier that morning) and Ms. Paynter stated "You understand you are not to show up at the

office before 1:00pm, IS THAT CLEAR?") Why was it so important to state that over again and in a loud mean spirited way? It felt as if they wanted to get to the office before me to try and find something more to fault me for. Two MH administrative staff was sent to meet me to watch that I didn't take something that "belonged to the government." I was made to leave all of my personal resource files that I had developed over the years, any power points I developed or materials I developed related to the program were said to not be mine and I was not allowed to even keep a copy of my own work. Folders and Personal notebooks were grabbed out of my hand and I was not allowed to review them to remove any personal information. They were taken and it was two weeks before I was allowed to go through them (in the presence of admin. staff). No other staff person was or has ever been treated like this. They were told to clean out their desks but no one went with them and they were told to just go when they could. I was seriously treated like a criminal and completely put on display for all the staff to see. Maybe that was an intimidation tactic toward them so they don't dare question anything like I did.

Facilities I had recruited and established good relationships with and brought from deficient to deficiency free have been dropped from the program because the supervisor decided to change the travel distance which is not in line with the National goals of rural outreach and working to maintain veterans in their communities. Staff continues to place veterans without waivers in these homes and other non approved homes which are not VA inspected or monitored. This is in violation of the federal law as well. Other examples: I was ordered not to follow the directions of National leadership in how the diagnosis of dementia was to be coded. I was told not to follow up with several veterans placed in our approved homes. All veterans in our homes were to be given the option for case management but always are to be included in the monitoring and compliance activities, yet I was told to have nothing to do with them. Other examples: I was told not to admit veterans that were not mental health patients which is clearly discriminatory as the law does not exclude any veteran who needs that level of care. I was told not to assist veterans in obtaining resources to cover the cost of their placements which is clearly stated in the program handbook as one of the roles of the program. I was told not to talk to anyone at the medical center without first going through the supervisor. How can anyone be in charge of a program and coordinate program activities if they are prevented from talking to key staff and working on collaborative resolutions? (Clearly a control tactic on the part of the supervisor and chief as I had been able to accomplish complete development of the program and processes prior to this supervisor) Her goal seemed to be to bring me down. Several of the program goals I was working on to correct problem areas such as with the resolution of the ER problem, were in the works, yet I was stopped cold and prevented from any further growth and assimilation of the program into medical center processes. At one point the supervisor and chief met secretly with the Medical Foster Home (MFH) coordinator (a program that I was responsible for getting funded for our medical center) and ask her to take the medical patients that were in my program. I was not invited to this meeting nor ever informed about it by my supervisor or the chief. This was intentionally done behind my back. The MFH coordinator informed me about it after the fact and stated that she tried to explain to them that the patients in her program had to meet HBPC criteria, as I had previously told them. They would not accept any information from me even though I was on the National Advisory Board and often consulted by field staff across the country.

When I would be instructed to make a change that was not consistent with the National

Handbook or expectation of the leaders in Washington, I would reference the federal law and try to explain the goals and expectations only to be dismissed by statements like, "We don't care what the law says, we can do whatever we want."

There is clearly discrimination and I have been a target and treated differently. The hostile co-worker was protected and returned to her job (that she didn't do consistently) her behavior and actions were covered up and I was used as a scapegoat for managements failure to fill a position and require me to do two jobs. They got in trouble for not filling the position and were then mandated to fill it. So they removed me and then filled the position returning the program to full staff. They also cut the number of homes and facilities and reduced the patient load by half. Not only do they now have a full staff but they only have half the work. I was completely taken advantage of and exploited and these things were intentional to create an impossible situation and set me up to fail.

Currently I remain in the group office doing data. On March 7, 2013 I was called to the Chiefs office along with a union representative to be presented with a proposal for my removal. The removal is being based on the visits I was unable to make while covering the case manager's position (which they were fully aware of the entire time). This is clearly a set up. It took them until March 7 (almost a year) to come up with something. All they could come up with was what they already knew related to visits. I still had contact with the facilities and the care providers regularly and was constantly involved in crisis management and assisting with veterans in obtaining services as well as assisting staff daily. They were all seen by plenty of "healthcare professionals" during that time and were not lost to follow up as they are now by removing the homes from the program. They couldn't find anything else to fault me on, although the supervisor tried and spent a month herself, going around to the homes and looking for more. And I suspect they went through my office when I wasn't allowed to return. I did a good job and worked almost every single day until 6 or 7 pm or more which I was never compensated for. In fact I was told I couldn't work over so they wouldn't have to pay me if I did, yet I could never have kept up as well as I did if I didn't.

The other reason cited is my habitual tardiness which they recorded daily as they made me report to a manager every morning. This was after having staff reported to them when I arrived; despite we had key cards that logged our time anyway. And I always entered requests for leave. I have never been untrustworthy and suddenly I'm treated like I am a cheater. It didn't matter if I called that I was running late or not. I was never allowed to use my annual leave and charged AWOL regardless. I ask for a 30 min. accommodation multiple times and denied despite having documentation from 2 physicians. Other staff have been afforded the tour I was asking for and there was/is no reason what so ever not to work with me (other than they would have had nothing to document). I have been here for 26 years and have only 4 more until I retire from Federal Service. The only bad evaluation I have ever received was the first one given me by this supervisor (although it was still satisfactory). The last one in October sites nothing to warrant suddenly deciding to remove me. In fact, it states nothing negative at all and was also satisfactory. I have worked hard my entire career and gone above and beyond every day. I have more than made up, every single day, the 15 min. I'd be running late in the morning, regardless of not being paid and being charged AWOL and WP. I stayed anyway because I was not trying to cheat anyone ever. If anyone has been cheated here, it's me. Even when I obtained the

documentation for FMLA and requested to use that in the mornings (as it is always related and documented in the letters from my physician.), I was still charged AWOL. The one day I forgot to report in as I had a major migraine, and came straight to the office and began working, I was not paid for the 21/2 hours before the chief laid eyes on me. Despite witnesses that I was at work and working. There are multiple examples of charging me AWOL unjustly and being denied FMLA. AWOL implies purposeful intentional and unreported absence, like someone not showing up to work and not calling at all. I have never ever done that. It didn't matter if I called in the morning or didn't call in the morning the result was still AWOL.

The letters of instruction were to cover their actions so that they could try and justify treating me differently and unfairly and humiliate me every single day. I was never given a warning or anything that would have given me even a thought of being fired. In fact all of the managers hardly talk to me at all now. Only to "log me in" and after that I pretty much don't exist to them. I was once considered one of the leaders as a coordinator of a program and folks sought my council or opinions, smiled, said Hi and were friendly, etc Now I am shunned and ignored and folks who use to look up to me, now turn their heads and ignore me. I have been made out to be some kind of monster and I'm probably one of the nicest people in this department with one of the biggest hearts. I am a good leader and fair and positive and yet a couple of people in power have been able to slander me and change how I am now perceived by others. There are a lot of new folks in the department who don't know me and will never know me as I rarely have an opportunity to interact with anyone. I've never been fired from a job in my life and this is not deserved and wrong on every level. I've never been a trouble maker nor been disciplined and have always worked hard and well with others. What they are doing is vicious and mean spirited.

I have been applying for other jobs to get out from under this management group with no luck so far. I had an interview just two days before receiving the proposal to remove me. Even if they were interested in me, the pending action now in place would prevent HR from offering me the job. So obviously I was not selected and although I know the individual selected and have seen her name on paperwork related to the position she filled, I've never received anything from HR advising me that I was not selected. This is so unfair and discriminatory.

I wrote an oral response to the Director and have met with him in person about the proposed removal. The rumor is that the chief of staff is really the person that runs the medical center and the director does whatever she says. She is tight with my service chief who is doing this so I feel like this is all a matter of just going through the motions. The corruption and favoritism comes from HR and the top and has been well known at this medical center for years. Even the chief of Chaplin service, who has been here for many years, can attest to the same. I'm 52 years old with a child at home who has his own mental health issues. I'm scared and alone and can't believe I've been put in this position and that this is happening to me. My anxiety has escalated and I'm getting more and more depressed. It is so hard to walk down the hall of shame every single morning and to come to work every day where I have been made to feel I have no value. I'm worried about being able to take care of my family and I am trying to fight this but I don't know what else to do.

All of this feels very much like a cover up by management in relation to the hostile co-worker who subsequently was put back in the program and in her position. Someone got in trouble for something and I've been used as the scapegoat. In my efforts to do the right thing and bring

concerns to the attention of headquarters and the OIG, I have systematically been the recipient of continuous retaliation which progressed to now this proposed removal. Multiple instances of pre-selection, older seasoned workers removed or targeted so much they voluntarily leave their positions, and many current staff who are afraid to speak up because of what repercussions may come their way. Someone needs to stop the abuse of power by these managers here and return our medical center to a place where we want to come to work without fear or degradation and an imposed paranoia of what is going to happen next and who it's going to happen to. Not only does my situation need be corrected and my name and reputation cleared but other employees at this medical center need help as well.

**Non EEO Reprisal More Details: What specific information do you have to support your belief that the personnel action was not justified?**
Barbara Kehoe the Risk Manager for this Agency conducted a review of the CRC program. In an E-mail Ms. Kehoe stated that her review was only reviewing patient records and not directed at any employee. She further stated that no decisions would be made based on her review but rather recommendations for program challenges. She also stated that the results of her review would be discussed with me as the program coordinator and with leaders of the department where it is aligned. This never happened as I was excluded from all meetings and discussions related to the program. No one was as familiar with the program as I was yet I was never included. In fact, part of the review conducted by Ms. Kehoe looked at whether H&P's and TB tests were in the patient records. It should be noted that not all veterans had their H&P's and TB tests performed at the VA but rather went through a private facility or private provider for their care. This was charted on a spread sheet maintained by myself as the CRC Coordinator and Kim Ismaili, the program support assistant. It is not a requirement for the VA to be the sole provider for H&P's and TB tests as long as they are performed once a year and maintained in the patient record at the CRC home or facility. Our responsibility was to ensure the facilities were in compliance with this standard which was established under state regulations and which we reviewed specifically during our annual inspections. Had I been included in the meetings and discussions, I could have explained this and provided the documentation. Instead, Ms. Kehoe was incorrectly guided in her review resulting in the assumption that veterans did not have a history and physical exam and subsequently this has been cited as a component of this proposal, as not doing my job which is completely false. In addition, Ms. Kehoe elaborated that her review came about after a recent IG report and several articles in the paper about residential homes. The report Ms. Kehoe was referring to and is included in the evidence file, was actually completed in 2004 and was one of the reasons this medical center and other medical centers across the country were able to obtain funding to start a CRC program.

I believe the HR representative; Chris Rowzee falsified information in the letter she wrote as a cover to the handwritten worksheet completed by Ms. Kehoe. Based on the information in the emails I received from Ms. Kehoe and the fact that she stated to the Union president, Sandy Richardson that she "did not see that much wrong with the program," I do not believe she recommended the Coordinator be removed as was stated by Ms. Rowzee in the letter. Ms. Kehoe no longer works as the risk manager and transferred to another VA position.
When I started the CRC program in 2005/06, I built it from the ground up. I independently completed all the research, developed policy and SOP's, etc. Utilizing the expertise of the chief of Social Work in California, Paul Burton and Social Work supervisor in Little Rock Arkansas,

Pat Gray. These two individuals were responsible for the development of the original program in the mid 50's and eventually the Federal law by which it operates today. Because of my hard work and the development of a solid program which corrected all of the areas sited in the 2004 OIG report, it was considered a model program and was recognized at the National level. I was one of 4 field coordinators selected to serve on the National CRC Advisory Board. In less than four years we had grown to approximately 27 facilities and were approaching close to 100 veterans in placement. Documentation standards and templates I had developed were adopted by many other VA's and used as the foundation for the development of national standards. I presented at both CRC and MFH conferences covering topics of case management, documentation, suicide prevention, quality management and establishing cost of care. I was ask by the National director for Geriatrics and Extended care to serve on the TAG for the National GEC survey and was responsible for the first coverage of the CRC program in the survey. I am considered one of the experts for the CRC program across the country and have mentored many new coordinators as well as provided background information for the new National CRC Director.

Because of my work with the CRC program, I was asked to assist in Washington with the role out of the Medical Foster Home Program. It was because of my involvement in the development of the Medical Foster Home program (a subset of CRC) that this medical center was funded to start the program. The National GEC Director, Tom Edes, requested that I be detailed to Central Office for several weeks to assist with the initial role out of the program in 2008. One is not selected for these things by Central Office if one doesn't know what they are doing.

A direct violation of the CRC Program Handbook 1140.01 and National law occurred when Ms. Taylor pulled the SW case manager from the program a year and ½ previous and told me I was to do her job too and told the other case worker that "her job would not change, just mine." It specifically states that "In addition" to a Program Coordinator, there would be a case manager for every 20-50 patients depending on the number of facilities and distance traveled, etc. My position as the coordinator was administrative and I did not regularly make visits to patients. I did the screening of referrals and worked a lot with the initial placements but did not do the monthly follow up visits. That was the case manager's job. I repeatedly told Ms. Taylor I was doing the best I could but I was not able to keep up with both jobs. I told her I was extremely concerned that neither job was being done properly, effectively or thoroughly and asked consistently when the position was going to be filled. I provided her with a detailed report that outlined the cost savings the program was providing for the medical center to assist her in demonstrating the need and fiscal ability to fill the vacant position. Ms. Taylor told me she had provided the report to front office leadership who had no interest in cost savings and were only interested in making money. In a meeting I later had with Dr. Rothschild, she confirmed that she was never provided with the report. Ms. Taylor was fully aware of the situation and to now use the fact that I was unable to make all of the monthly visits as grounds to remove me from federal service is devious, deceitful, unethical and just plain wrong. I had never denied and had told Ms. Taylor all along that it was impossible to get to all of the visits every single month. She was fully aware of this, stating she understood and to do the best I could. It is also important to note that the handbook states the veteran should be seen monthly by a "healthcare provider." If you review the records of all of the veterans, you will find very few if any that were not seen just about every single month by a "healthcare provider." Some were MHICM patients or followed by

other special programs. Most were seen by their Primary care providers or mental health providers and I had arrange for most all of the veterans in the program to be seen by dental due to their eligibility through the program. I was in regular contact with all of the CRC sponsors and routinely reviewed the veteran's records for changes and consistently provided the caregivers with updated statements of needed care.

Unlike the case manager, Ms. Turner who was not doing two jobs, yet she failed to consistently update the caregivers with statements of needed care, many for several years. I regularly had to assist Ms. Turner with her cases and repeatedly received calls from sponsors of the homes she visited. There was not a day that would go by that she was not in my office needing help with something. This often resulted in my needing to go with her on her visits or meet with a facility administrator or caregiver. I may not have made a visit every single month on every single patient however I was fully aware and in contact with all of the caregivers regularly and no patient needs were ever unmet. This can be verified by Kim Ismaili, the program support assistant and Gary Kelton, the peer support specialist that worked with our team. The time I spent assisting Ms. Turner also took away from time I had to make visits, yet as the Program Coordinator, I had to be available and responsive to the staff and their needs. I also had to sign off on all of Ms. Turner's documentation which was time consuming as well as complete required reports. All of this is related to the clinical work of the program and does not include all of the work I was responsible for related to coordination of the inspection team, inspections of the facilities, assimilation of reports into a final report follow up on any deficiencies, etc. Just a week or so before I was removed, Ms. Taylor met with my team and told us that the position for the case manager had finally been approved. We were going to get the case manager position filled that I had been trying to maintain as best I could for almost 2 years. This validates that I was in fact expected to do two jobs and subsequently punished.

Ms. Taylor repeatedly refused to support me in my role as the coordinator. I brought to her attention written complaints I had received about the case manager from the care givers and discussed with her my plan to address the problem, through an assignment change. She stated she was in agreement with my plan. Once I implemented the assignment change, Ms. Taylor denied that I spoke with her about it and directed me through an e-mail not to make any changes without discussing with her first. I was not allowed to solve the problem and therefore lost credibility with the caregivers who had made the complaint, having re-assured them that as the coordinator it was my responsibility to assign the work of the staff (which it was) and I would make the change to resolve the issue.

I was doing the right thing and rather than protect me and the other staff and support me as the coordinator, they minimized this case workers behavior and never acknowledged that the staff had reported a hostile work environment, created by Ms. Turner, but rather have covered up all of her wrong doings and made me the scape goat. They used her as a spy to sit in our program meetings and take notes word for word. Then I would randomly get a call from Ms. Taylor questioning something that she would have no knowledge of, if not for the case manager's report. Ms. Taylor later denied that she had meetings with the case manager and stated it was Ms. Paynter who had met with her often. I reported to Ms. Taylor instances of her throwing things in my office, yelling at me and stating to me that there was something wrong with me because I don't "think like everyone else," that Ms. Taylor and management refused to address. There are

multiple individuals who have witnessed her behavior towards me and others as well as documentation on a caregiver training evaluation pointing out the disrespect shown to me by Ms. Turner. In addition to my report to Ms. Taylor, the other two staff members, Ms. Ismaili and Mr. Kelton also reported concerns to their supervisors regarding the hostile work environment created by Ms. Turner.

Ms. Taylor had stated to me she would arrange a meeting with the case manager's supervisor, Mr. Whittiker, and failed to follow through. We also had agreed that I would contact him about the situation. However, when I attempted to meet with Mr. Whittiker, he stated to me he was told, by Ms. Taylor, not to talk to me. (A message I have in writing)

She used her and a couple of specific cases to create the appearance of a problem with one of our homes and accused the sponsor of wrong doing. I did not agree with what was transpiring and she refused to even allow me to share my perspective. She accepted the biased opinion of the case worker and when I confronted her about not giving me the opportunity as the Coordinator to offer a different perspective, again she said it came from higher than her and she was just doing what she was instructed. She accepted the word of this case worker who was an RN and not her supervisee and who had no facts to substantiate anything she was claiming. She was supposed to be my supervisor and would not even allow me the opportunity to discuss the case or my perspective with her. In fact, she made decisions about the case in my absence and then had the secretary call me at home to tell me it "would be ok" for me to stay home another day and deal with my water heater situation. This was completely out of character for her to offer any kind of understanding or nice gesture. When I didn't accept the invitation to stay home another day and came to work, the case manager stated that she "thought I wasn't going to be there." How would she have known anything related to me staying home if she was not aware of Ms. Taylor's plan to have me stay home? My authority as the Coordinator of the program was completely undermined and she began to dictate orders that were not consistent with the federal law. For example, I was instructed not to follow the guidelines sent by central office related to how dementia patients were to be coded. A change was being made nationally to utilize the 121 code rather than the 503 code. I was told to continue to code under the 503.

I was accused of not following the chain of command when I had simply made a referral on a veteran who met criteria for a national TBI pilot. I have practiced independently for many years and suddenly now I wasn't following chain of command. The veteran was accepted for the TBI pilot but rather than see this as an accomplishment and recognize the work it took, as there were only 5 veterans accepted in the country, she turned it around and made it a chain of command issue. Social Workers make referrals every single day to obtain resources to meet veteran needs. This was not as she had portrayed it. In fact, another supervisor had commented to one of the staff that I should have gotten an award.

Every time I tried to take action as the coordinator to fix a problem, I was told I couldn't talk to anyone in another service without going through Ms. Taylor first. This comes after I report positive results and near resolution. How can anyone be in charge of a program and coordinate program activities, if they are prevented from talking to key staff and working on collaborative resolutions? Time after time I was treated like I was not capable of performing coordinator functions, yet I had started this program from scratch and independently managed the program

without any problems before Ms. Taylors position was created. I had served on the hiring panel when Ms. Taylor was first employed approx. 5 years ago.

All of the orders and control tactics were used to sabotage my efforts as a coordinator because I would handle things then be prevented from following through. The emails accusing me of not following policy and acting like I didn't follow her "orders" which is how she stated things are untrue. Or her "directive." Very hostile and un-necessary. When I was asked to do something that was not consistent with the Federal Law that governs the program, I would point it out. I never intentionally or willfully ever refused to follow directions. When I would question an instruction that was not consistent with the law, I was told by Ms. Wheatley that "they"(MH leadership) "did not care what the law said and could do whatever they wanted." I was told by Ms. Taylor that MH did not have to go by any directive from GEC. (Even though the program is aligned under GEC at the National Level) As a member of the National CRC Advisory board, I was fully aware of the program regulations and how it was to be managed. One does not get selected to serve on an advisory board if one doesn't know what they are doing.

I didn't trust meetings with Ms. Taylor any longer because repeatedly she would act supportive in the meeting and then turn it around and lie and not support me. Not once did I receive from her the support given to the other coordinators nor the validation as a coordinator. I was the only one never ask to cover as supervisor. I was over looked for trainings and denied approval to attend even local ½ day trainings that I was going to pay for myself and were relevant to my work. There are plenty of people if asked who would confirm that I have been treated differently.

I was never given the opportunity to return the program to its previous level. Nor was I informed as to why I was being removed from the Coordinator position. I was simply told by Ms. Paynter that as the chief of mental health, she could re-assign someone anytime she wanted. She further stated to me that I was not harmed as I was still a "Coordinator" and my grade did not change. Despite these statements, I was placed in an office with 5 other people to do nothing but data entry for the past 11 months. I was not treated like a "Coordinator." I had nothing to coordinate; I was never invited to the coordinator meetings and in fact removed from the coordinator email group.

I was repeatedly denied accommodation for a flexible schedule as well as simply a 30 min. change in tour. To add to this disparate treatment, I was charged AWOL even though I called as required. In fact, I am thinking that they are approving my SL and CB as nothing had been said to me any differently, and I later find that they approved none of it and charged me AWOL and posted me WP. The person in the office that we report to said to me that he was told to send me to a manager if I called. I ask if this was a change in our procedure that everyone now had to do and he said "no, just you." In other words, treat me differently from everyone else. I had requested accommodation for my disability for a 30 min. window of flexibility in the morning or to change my tour by 30 min. They repeatedly refused and have denied both accommodation requests I have submitted stating they don't have enough information to establish that I am an individual with a disability and that it doesn't meet the agency needs. I have turned in Dr. Statements to this affect. I have demonstrated that the problem would be resolved with this accommodation and have appealed to the supervisor for help in this area and support but they would rather deny me an accommodation so they can continue to shame me and document

AWOL's to use against me.

I am a good employee and this is my greatest weakness and has been for my entire life. I deliberately have been set up to fail in this area. They know it's a weakness and rather than have a solution, they keep the problem fresh and shame me each and every day by having me "check in" every morning. They have nothing else to fault me for so they capitalized on my difficulty to flaunt their power and control. I am the only professional staff person that has ever had to succumb to this kind of treatment. They also are completely aware, by being in the field of mental health, that this is a common weakness and diagnostically significant for my disability and have targeted it. The mental health department and the VA on a National level, is supposed to be about the recovery model of care and helping people move forward despite their disabilities and yet they don't practice what they preach in the treatment of their own staff. Our own HR departments' strategic plan calls for flexibility yet I am repeatedly denied.

After I disclosed my disability, the treatment by management only got worse. The stigma and unfair treatment became obvious to me as well as to others. The last case manager randomly asks me one day what Ms. Taylor had against me. A number of other people have also asked me why she picked on me or why she didn't like me. Or what did I do to "get on her bad side?" Management has used knowledge about my disability and their position of power to intimidate me and make me fearful.

I have been clearly targeted and it has become psychologically and emotionally unsafe. Other staff has been intimidated by watching how I have been treated and fear it happening to them. The friendly supportive atmosphere at this medical center has disappeared and is now fear based. My symptoms increased from the harassment and bullying I endured and I developed increased anxiety and near panic when I would be running a few minutes behind. My physician added an additional medication to help me cope with the increased stress. There are plenty of people if asked who would confirm that I have been treated differently.

The bullying and punitive treatment to break me down, the approaches she used, were stigmatizing and brought attention to my shortcomings. Others were asked to report when I arrived to work and I had to call her from my office phone as soon as I got in every day. No other coordinator has ever had to do that. The others in the office were keenly aware of all this. Ms. Taylor put me in a vulnerable position and stripped me of credibility and respect of my peers for something I couldn't help. I have felt shamed and humiliated. Charging me leave without pay repeatedly, created even more of a hardship and has resulted in a negative financial spiral down. The impact of this harassment and bullying on my mental health and life overall has been significant. Managements refusal to allow me a small window of flexibility (which would have completely changed all the dynamics in how I was viewed by others and eliminated all the stress and anxiety with no impact on the program, medical center or veterans), instead targeting my weakness and involving co-workers to report my arrival time despite the fact that we had key cards to enter the office which recorded the time, was intended to exploit me and make me fail. I am the only staff member required to report to management upon my arrival to work and the only one not allowed to call in to the call in line. I was issued several letters of instruction about my tardiness as their way of covering up their discriminatory actions toward me and then strategically and routinely refused to grant any use of leave documenting my arrival time each

day and charging me AWOL. I have been put on display and have to walk down the hall each and every morning and locate a manager to "check in." The shame and humiliation that I am put through every day is abusive and intentional. They have felt justified in doing this to me and seem to have the support of HR which really concerns me. How could our HR support management in this kind of treatment of employees?

It should be further noted that the agency additionally failed to honor my FMLA requests after requiring me to provide additional documentation from my physician, and therefore charged me AWOL illegally. I have never been disciplined and have always had a satisfactory or exceptional evaluation. I've been a dedicated hard working employee here for 26 years.

**Non EEO Reprisal Complaints Filed: Union**
yes

**Non EEO Reprisal Complaints Filed: Date Union Grievance Filed**
4/23/2012

**Non EEO Reprisal Complaints Filed: Union Grievance Outcome**
Nothing.

**Non EEO Reprisal Complaints Filed: agency**
no

**Non EEO Reprisal Complaints Filed: Date agency Grievance Filed**

**Non EEO Reprisal Complaints Filed: agency Grievance Outcome**

**Non EEO Reprisal Complaints Filed: Non EEO**
yes

**Non EEO Reprisal Complaints Filed: Date Non EEO Grievance Filed**
3/18/2013

**Non EEO Reprisal Complaints Filed: Non EEO Grievance Outcome**
Ongoing

**Non EEO Reprisal Complaints Filed: MSPB**
no

**Non EEO Reprisal Complaints Filed: Date MSPB Grievance Filed**

**Non EEO Reprisal Complaints Filed: MSPB Grievance Outcome**

**Please use this page to describe additional incidents related to the PPP Category you have chosen.**

**Please describe your complaint in detail.**
After more than 4 years of harassment, bullying, intimidation and deformation of character/slander, lies, I filed a grievance in April 2012, against Ms. Gaila Taylor, my immediate supervisor, sighting one of multiple e-mails where Ms. Taylor had instructed me to act counter to the program Handbook and Federal law. The course of harassment spanned the entire time she has been my supervisor and appears strategic and intentional.

Not long after I filed the grievance and had the 1st step meeting with Ms. Taylor, I was "temporarily" removed from my position (5/7/12). She was waiting for me to arrive at my office and proceeded to tell me I had been "temporarily" re-assigned and to report to her office at the hospital immediately. I was not allowed to finalize anything I had been working on, make return phone calls, complete patient documentation from recent visits, etc. I had to leave right then. I was given busy work looking up data. That afternoon, I was using my laptop which was the computer issued to me. Ms. Paynter, The MH Service Chief, happened to come into the office and I saw that she noticed I was using my computer. She said nothing to me. The following morning(5/8/12)Ms. Taylor stated that HR sent her a message instructing her to take my computer and cell phone. She said Chris Rowzee (HR) sent her an e-mail about 6 pm which she stated she saw when she arrived to work. When I inquired as to why, and she stated she is just doing what she was told. I requested to be allowed to forward my personal folders off of the desk top. Ms. Taylor said she didn't know and called Ms. Paynter into her office. She ask her if she was aware that Chris Rowzee had instructed her to take my computer and phone and Ms. Paynter stated no but "if that is what she said then do it." (It appeared much like Ms. Paynter was going along with whatever Ms. Taylor was saying.) Ms. Taylor stated to her that I ask if I could forward my personal folder and Ms. Paynter very gruffly stated to me that if I had a personal folder on the computer, I was in violation of federal law and I was to hand over the computer NOW. Ms. Paynter raised her voice and it felt very intimidating and hostile. I handed Ms. Taylor my computer and proceeded to get my messages off of my phone before handing it over and she stated to me "I need the phone now." I motioned just one second as I was almost finished and she loudly and firmly said "I NEED IT NOW" as she had her hand out and practically taking it from me with a very hostile and abusive tone. I was given no explanation as to why any of this was happening. The manor at which she retrieved the computer and phone was unprofessional, humiliating, demeaning and unnecessary. I was being treated like a criminal. I contacted the union and advised that my computer and phone had been taken and that I had to sign for those through the IT department and was responsible for them. They spoke to HR who instructed Ms. Taylor to write a statement that she had the computer and phone and was assuming responsibility. I DO NOT BELIEVE Ms. Taylor RECEIVED A MESSAGE FROM HR, BUT RATHER DID THIS ON HER OWN, AND THEN CONTACTED HR WHO BACKED HER. I ASKED THE UNION TO REQUEST THE MESSAGE BE FORWARDED AND THEY TOOK HR'S WORD FOR IT. CHRIS ROWSEE (HR) IS THE SAME PERSON WHO DIDN'T FEEL MS. TAYLOR WAS INAPPROPRIATE IN HER MESSAGE CLAIMING I HAD VIOLATED HIPPA, (a year or so previous-see documentation) WHEN THE PRIVACY OFFICER I HAD ALREADY SPOKEN TO ABOUT IT CLEARLY SAID SHE WAS INAPPROPRIATE. I BELIEVE THEY MAY BE FRIENDS AND HAVE SOME KIND OF CONNECTION.

The grievance proceeded to step 2 in which I met with Ms. Paynter (5/30/12). She seemed to look through me and was not listening to anything I was saying and had a smirk on her face the

whole time. She said nothing. Even when I stated that she and I had a good working relationship before Ms. Taylor became my supervisor, I did not understand what had changed. (I had three years of exceptional evaluations from Ms. Paynter and multiple compliments on the good job I was doing, when I reported to her directly and prior to Ms. Taylor's position) She did not verbally respond, just maintained the smirk. Several days later (6/5/12), Ms. Paynter called me to her office to have me sign a paper stating I was permanently being re-assigned. I expressed that I did not understand and she said there was nothing to understand and that she could chose to re-assign someone if she wanted. I again stated I did not understand what was happening and that this felt punitive and unfair and made no sense. She said in a condescending tone of voice that this was not a disciplinary action and that I was still "a Coordinator" and the same grade so there was "no harm done to me." She was very pushy for me to sign the paper stating I was only signing acknowledgment of receiving the letter. She would not answer any of my questions or offer any explanation. This decision to permanently remove me from my job came right after I had the 2nd step grievance meeting with her. At that meeting I indicated that the "temporary" re-assignment was retaliation for filing the grievance against Ms. Taylor. She denied nothing.

The temporary re-assignment was made permanent and still with no explanation. Approximately 3 days later, my former position was re-posted (closed on 6/27/12.) Another SW was upgraded and put in the position temporarily. I had predicted who would be assigned the position temporarily because I watched Ms. Taylor groom her for the past year. (Clearly pre-selection)

I have not done anything wrong nor been accused of any wrong doing. I have been a part of the CRC National Advisory Board for 4 years, one of only a few coordinators in the US chosen to be a part of the national board. I have been in close contact with the folks in Central Office from my role on the board. One is not chosen for that if they do not know what they are doing and then to remove me with no explanation. I have multiple acknowledgments from board members and other CRC Coordinators across the country whom I have mentored and whom have modeled their programs after mine. This was an attack on my character and another hostile action making me appear to have done something so horrendous that I was removed. My peers and colleagues have no idea what has happened but the impression and appearance these actions leave is negative and the assumption is that I have done wrong. This has been intentional and vicious and has harmed me professionally and emotionally. My reputation has been damaged, my contributions after 26 years minimized and discarded. Peers pass me in the hall and don't make eye contact. Some have volunteered the explanation that others fear the same thing happening to them if they associate with me. I feel isolated and alone and in fact have been put in an office with multiple people and have no desk or computer of my own and no place to secure my belongings. I have to use whatever happens to be available. The chair I was issued 10 years ago due to my back problems, and have taken to every location I have worked still remains at my former office location. I have requested it multiple times with no response or resolution. I was stripped of my dignity and hidden away like a leaper.

I was given a job description that was created far below my level of experience, skills and knowledge. Generic in nature with nothing to do but gather data or whatever else she decides to have me do. Completely degrading and a demotion even if my grade and pay didn't change. When given the job description (6/6/12), I stated I still did not understand and I was not at all happy with what was going on. Ms. Taylor simply stated she was "following orders." I have

been humiliated and embarrassed in front of my peers. My professional reputation has been destroyed. I've been shamed and made to feel like a criminal when I didn't do anything wrong nor was I ever told about what the actions were based on. I have done nothing to warrant removal from my position. This was about nothing more than control and Ms. Taylor wanting things her way and likely a cover up for wrong doing and failure to address the hostile work environment issues created by, now a former co-worker. I was the obstacle in the way because I brought serious issues to the attention of my supervisor and the chief and because I wanted the program to run like it's designed to by regulations and we were often not in agreement. She used her authority as my supervisor to intimidate me and sabotage my efforts. I did not feel safe meeting with her or discussing anything with her because she repeatedly misquoted me, lied and denied things that she had said. (I have multiple examples)

Ms. Taylor repeatedly refused to support me in my role as the coordinator. I brought to her attention complaints I had received about the case manager from the care givers and discussed with her my plan to address the problem, through an assignment change. She stated she was in agreement with my plan. Once I implemented the assignment change, Ms. Taylor denied that I spoke with her about it and directed me through an e-mail not to make any changes without discussing with her first. I was not allowed to solve the problem and therefore lost credibility with the caregivers who had made the complaint, having been re-assured that as the coordinator it was my responsibility to assign the work of the staff (which it was)and I would make the change to resolve the issue. I was prevented from doing that.

I was doing the right thing and so to cover up for the case manager, I became the scape goat. They protected this case worker and rather than address the hostile working environment and protect me and support me as the coordinator, they minimized her behavior and used the fact that she was mad at me for attempting to change her assignment in response to the complaints, to sit in our meetings and take notes word for word. Then I would randomly get a call from Ms. Taylor questioning something that she would have no knowledge of, if not for the case manager's report. Ms. Taylor later denied that she had meetings with the case manager and stated it was the chief, Ms. Paynter who had met with her often.

Ms. Taylor had stated to me she would arrange a meeting with the case manager's supervisor, Mr. Whittiker, and failed to follow through. We also had agreed that I would contact him about the situation. However, when I attempted to meet with Mr. Whittiker, he stated to me he was told, by Ms. Taylor, not to talk to me. (A message I have in writing)

The attitudes and behaviors of the case manager, whom I had discussed with Ms. Taylor, continuously created a hostile work environment. Other program staff reported the same to their supervisors and I reported to Ms. Taylor, instances of her throwing papers in my office, yelling at me and stating to me that there was something wrong with me because I don't "think like everyone else," that Ms. Taylor refused to address.

I had disclosed my disability when again requesting a reasonable accommodation for a flex tour or 30 min. change in tour,(7/11/11) and this case worker began treating me like a second class citizen and making comments as stated above. She would raise her voice if she disagreed with something I said and often refused to perform her job as requested. She was disrespectful to me

in the presence of others including the caregiver sponsors in the program whom we provided training for twice a year. (One sponsor made the comment in her documented evaluation about the disrespect shown to me.) Nothing was ever done to address this issue and support me but instead this person was supported in her behavior and has now been returned to her job in the program. The person, who created the problems and spoke the loudest and stomped off to do whatever she pleased, has been rewarded and returned to the program. I have been informed by other staff who work in the same clinic that she has stated I'm "crazy" and it was "all her fault." (referring to me).

Ms. Taylor used this case manager and a couple of specific cases to create the appearance of a problem with one of our homes and accused the sponsor of wrong doing. I did not agree with what was transpiring and discussed the situation in detail with the National Program director in Central Office. Ms. Taylor refused to even allow me to share my perspective. She accepted the opinion of the case worker and when I confronted her about not giving me the opportunity as the Coordinator to offer a different perspective, again she said it came from higher than her and she was just doing what she was instructed. She accepted the word of this case worker who was not her supervisee. She was supposed to be my supervisor and would not even allow me the opportunity to discuss the case or my perspective with her. In fact, she made decisions about the case in my absence and then had the secretary call me at home to tell me it "would be ok" for me to stay home another day and deal with my situation. This was completely out of character for her to offer any kind of understanding or nice gesture after the multiple AWOL's she punitively issued and continues to issue. When I didn't accept the invitation to stay home another day and came to work, the case manager stated that she "thought I wasn't going to be there." How would she have known anything related to me staying home if she was not aware of the plan to have me stay home? The case worker did not like my instructions related to the case so she ran back to Ms. Taylor who instructed her to do something else under the auspice of it came from higher than her. My authority as the Coordinator of the program was completely undermined and she began to send accusatory and untrue statements in emails and dictate orders not in line with our handbook and federal law.

As soon as I had turned in the written complaints related to the case manager, to the chief and the supervisor, all of this seemed to blow up. I was doing the right thing and so to cover up that management had not acted appropriately, I became the scape goat. There are multiple notes in pt. charts which are inaccurate and plain falsehoods from the month the supervisor went around to all the homes and patients. (See samples in the time line document) Every time I tried to take action as the coordinator to fix a problem, I was told I couldn't talk to anyone in another service without going through Ms. Taylor first. (Example of Emergency Room SOP developed with the Emergency Room chief – and then "ordered" to provide Ms. Taylor the name of who I spoke with and that I was not to speak to anyone without going through her first)(See e-mail in time line document) This comes after I reported positive results from my meeting with her and near resolution of the problem. Time after time I was treated like I was not capable of performing coordinator functions, and all designed to sabotage me because I would handle things then be prevented from following through. Or I would be recognized outside of the supervisor's domain and then she would find fault in some other area (to make sure I received no credit or kudos for anything I was doing). The emails accusing me of not following policy and acting like I didn't follow her "orders" which is how she stated things. Or her "directive." Very hostile and un-

necessary. (See e-mail samples in time line document)

I had a model program that was recognized nationally and many other programs were modeling their programs after mine. I had functioned independently for 3+ years when I developed the program, before she became the supervisor and suddenly now I was accused of not following the chain of command. Because of my VA years of experience and equivlent competencies as the supervisor, I didn't need to ask her what to do, as I knew what to do and had already been doing it before the department was re-structured. There was no warning or discussion that things would change related to coordination of programs, and in fact I was told by the chief of service that nothing would change when I expressed my concerns.

(Another Example of this same kind of accusation of not following the chain of command occurred the previous year related to a TBI patient referral and acceptance for a national pilot program. Other SW supervisory staff had relayed that I should receive an award for assisting this veteran and his family and advocating for his inclusion above and beyond and his subsequent acceptance in the pilot program. A good thing was falsely turned into something bad and I, as well as the program, was prevented from having any participation in this veterans care.) This made no sense and was completely counter to the National message and TBI initiatives. Ms. Taylor falsely accusing me of things such as a HIPPA violation (see documentation) and stating she had received "complaints" which she could not produce nor disclose who complained (as I do not believe there really was a complaint) using this as the basis for the worst evaluation I had received in 25 years. (Following 3 years of exceptional evaluations by my former supervisor).(See letter of disagreement with evaluation-(11/09) This was about nothing other than exploiting her position of control There are multiple other examples.

A direct violation of the program CRC Program Handbook (VHA HANDBOOK 1140.01) and National GEC policy occurred when Ms. Taylor pulled the SW case manager from the program a year and ½ previous and told me I was to do her job too and told the other case worker that "her job would not change, just mine." I repeatedly told Ms. Taylor I was doing the best I could and I was not able to keep up with both jobs. Neither job was being done properly, effectively or thoroughly. Ms. Taylor knew all along things were getting behind. (When the risk manager did a review which seemed to come out of nowhere) I would not be surprised if Ms. Taylor didn't request the review herself after setting me up, to make it look like I wasn't doing my job when they found the things behind as I had never denied and was telling her all along was impossible to maintain without filing the vacant position. I welcomed the review and told the risk manager myself that I simply couldn't get to all the visits every single month and hopefully her review would demonstrate out need for the case management position to be filled. Just a few weeks before I was removed, Ms. Taylor met with the team and told us that the position for the case manager had finally been approved. We were going to get the case manager position filled that I had been trying to maintain. This validates that I was in fact expected to do two jobs and punished when obviously I couldn't keep up. At one point just a couple months prior, the chief had been in my face stating to me "You are NOT doing two jobs," when I had voiced this to her in a meeting. (see timeline document)I was in tears in that meeting from her harsh tone and abusive manor toward me. I tried to explain to her that in fact she knew I was and had been doing two jobs and was overwhelmed and simply could not keep up. It became apparent that nothing I said would make any difference and again left me feeling completely unsupported and

set up.

To add to this hostile treatment, I was constantly being harassed about being late and charged
AWOL even when I called as required. In fact, I 'm thinking that they are approving my SL
and/or CB as nothing was being said to me any differently, and I later find that they approved
none of it and charged me AWOL and posted me WP. The person in the office that we report to
said to me that he was told to send me to a manager if I called. I ask if this was a change in our
procedure that everyone now had to do and he said "no, just you." In other words, treat me
differently from everyone else. I had requested accommodation for my disability for a 30 min.
window of flexibility in the morning or to change my tour by 30 min. They repeatedly refused
and have denied accommodation requests I have submitted. I am an individual with a disability
and I have turned in Dr. Statements which confirm I am an individual with a disability. I have
demonstrated that the problem would be resolved with this accommodation which would have
had no impact on the program or veterans etc. and have appealed to the supervisor for help in
this area and support but they would rather deny me an accommodation of a simple 30 minutes
so they can continue to harass me and record AWOLs. I am a good employee and this is my
greatest weakness and has been for my entire life. I deliberately have been set up to fail in this
area. They know it's a weakness and rather than have a solution, they keep the problem fresh and
shame me as they have nothing else to fault me for. They also are completely aware, by being in
the field of mental health, that this is a common weakness and diagnostically significant for my
disability and have targeted it. The mental health department and the VA on a National level, is
supposed to be about the recovery model of care and helping people move forward despite their
disabilities and yet they don't practice what they preach in the treatment of their own staff. Our
own HR has "flexibility" in their strategic plan for this medical center. Although it is written, it is
not practiced.

After I disclosed my disability, the treatment by management only got worse. The stigma and
unfair treatment became obvious to me as well as to others. The last case manager randomly asks
me one day what Ms. Taylor had against me. A number of other people have also asked me why
she picked on me or why she didn't like me. Or what did I do to "get on her bad side?"
Management and specifically Ms. Taylor used knowledge about my disability and her position of
power to intimidate and make me fearful. I was clearly targeted and it had become
psychologically and emotionally unsafe. My symptoms increased from the harassment and
bullying. I developed increased anxiety and near panic when I would be running a few minutes
behind. My physician added an additional medication to help me cope with the increased stress. I
didn't trust meetings with Ms. Taylor any longer because repeatedly she would act supportive in
the meeting and then turn it around and lie and not support me. Not once did I receive the
support given to the other coordinators nor the validation as a coordinator. I was the only one
never ask to cover as supervisor. I was always left out. I was over looked for trainings and denied
approval to attend even local ½ day trainings that I was going to pay for myself and were
relevant to my work. There are plenty of people if asked who would confirm that I have been
treated differently.

The approaches used were stigmatizing and brought attention to my shortcomings. Others were
asked to report when I arrived to work and I had to call Ms. Taylor from my office phone as soon
as I got in every day. The others in the office were keenly aware of all this. Ms. Taylor put me in

a vulnerable position and stripped me of credibility and respect of my peers for something I couldn't help. I felt shamed and humiliated. Charging me leave without pay repeatedly, created even more of a hardship and has resulted in a negative financial spiral down. The impact of this harassment and bullying on my mental health and life overall has been significant. Managements refusal to allow me a small window of flexibility (which would have completely changed all the dynamics in how I was viewed by others and eliminated all the stress and anxiety with no impact on the program), instead targeting my weakness has been intentional to humiliate me and try and make me fail.

I confronted her with my perception of her actions and never received an acknowledgement or response and the punitive treatment and targeted harassment continues to this day. I later saw that my message to her was forwarded to HR stating I was hostile, which is completely not true. Anyone who knows me knows that is as far from the truth as it could possibly be.

When I was taken out of my position and relocated to the main building from the CBOC, I was instructed to report to a manager each and every morning. I couldn't go on to my office location when I arrived and call as I had been instructed before. Now I had to seek out a manager every morning and they had to SEE me. Even if they were in a meeting, the clerk was instructed to interupt the meeting so they could SEE me. I have been humiliated and shamed each and every morning for almost a year now. I am the only professional staff person who has ever been required to report to management upon arrival to work. I am also the only one not allowed to call in to the call in line like everyone else, but have to be specifically transferred to a manager. Regardless of calling, I am always listed as AWOL. I was issued several letter of instruction about my tardiness to cover their discriminatory actions toward me. It was interesting that my job was posted to include flexibility. I should never have been removed from it in the first place and of course was not selected. Based on some of the documentation when the supervisor took other program case managers and had them visit the homes in my program, it appears she had no plan for me to return even though I was only temporarily reassigned at the time. There are multiple references to "karen will no longer be visiting," before my re-assignment was made permanent. No one had more experience or was more qualified than me. I put the program together from the ground up. In fact the staff member selected (AAF under age 40) was hired and trained by me before Ms. Taylor was put in the supervisory position. This young lady was able to get a promotion because of the supervision, training and mentoring I gave her. I still have the email she sent thanking me for the good training, which gave her the experience for her promotion giving her the ability to apply for this one.(included in time line) It was obvious all these actions were intentional and discriminatory.

The actions taken against me by the Chief of the service, Ms Paynter and my supervisor, Ms Taylor are clearly abuse of power, retaliatory, discriminatory and hostile. I remain isolated in an office with several others, adding to the difficulties I have with distractions and concentration (also a component of my disability) with no real purpose other than reviewing and logging data that I could easily do from home or another location and free up the space needed for medical center staff. Although I maintain the title of "coordinator," I do not coordinate anything nor have I been included in the coordinator meetings or treated like the other coordinators. In fact, my name was removed from the coordinator email group. After I am required to walk the hall of shame every morning, (on display for everyone to see), I'm stuck away where I have no

interaction with any programs, veterans, staff (other than the few in the office)etc., as punishment. The room has been termed the "bull pen" or "misfit" room. My skills and enthusiasm for veterans healthcare is wasted and intentionally not utilized. In my efforts to cope with this treatment, I've tried to find a purpose and ways to be of value or help. I've utilized my knowledge and skills in developing SOP's for the department in areas where staff need guidance, and my efforts are ignored. I've identified policies that need to be updated and several areas where the department may be out of compliance and could exercise a simple performance improvement activity as all departments are suppose to do and no one from the management team has ever acknowledged the information or work I've provided. The coordinator title was only given to me so that they could say that removing me from my position did not harm me in any way.

I have always called or entered leave when I was running late and I have never been untrustworthy. I worked over most evenings and never complained or ever ask for comp time. I took calls on weekends and after hours and gave many many more hours then the few minutes I would be late. The program is community based. There was no reason what so ever for the rigidity imposed by the supervisor. I have always been a dedicated employee and worked hard my whole career. As a positive person, I never dreamed or really believed that people would intentionally set out to destroy someone until this happened to me. Someone in power who has an arterial motive can turn a good reputation and a valued employee into the appearance of a problem employee by targeting vulnerabilities and using these strategic strategies over time to destroy someone. The way I have been treated is wrong on every level.

Initially I was told nothing, while other staff have been told that I was removed because of violations and problems with the program. There were problems created by management in not filling the vacant position and directing me to manage the program outside of the regulations which I wouldn't do. The risk manager who reviewed the program told the union president that she did not see that many problems with the program yet the letter I received from HR when the union requested the report states it was recommended by the risk manager that the coordinator be removed. The actual written report made by the risk manager was never produced. These two statements as well as the correspondence I had with the risk manager are in opposition to each other. (see time line) And if that was the case, why were the other recommendations listed, not acted upon? The things the risk manager was asked to review were misguided nor part of the program responsibility. I was never consulted or included in any of the discussion about the program or asked to clarify anything or speak to anything that was program related. I was intentionally left out so that when something occurred that could be viewed as negative (when seen in isolation of any other facts or information), it could be looked at as "problems with the program" and/or "problems with the management of the program" and made out to be my fault. A complete set up. Everything was filtered through the supervisor who obviously had targeted me and had her own agenda. For example; information I had pulled together for her demonstrating the cost savings the program was having on the medical center to help her show the value of the program and be able to justify filling the case manager position, that she told me she submitted to the chief of staff was NEVER submitted. (Verified by the chief of staff when I ask her directly during my grievance meeting (6/29/12)and witnessed by the union representative.) (see letter to the chief of staff 7/10/12) When I expressed to her that I felt set up to fail by not filling the case manager position and that I had advised the supervisor multiple

times there was no way to keep up with both jobs and I wasn't able to make all of the visits every month, she ask me if I had that in writing. When I expressed that this felt like retaliation for having filed a grievance she rolled her eyes at me and said, "OH P_L_E_A_S_E!"

This program, the templates and procedures I developed have been modeled across the country and I was viewed as an expert at the National level yet treated at my own station like I was incompetent and a criminal. Most of the templates and much of my hard work has been deleted here. I was blocked from the Program folder where I kept inspection documents and logs of incidents and other important data. I was never asked to instruct anyone on anything related to the program or to show anyone where files were located or what the status of a veteran's case was, etc. I was NOT ALLOWED to complete my case documentation therefore creating more of an appearance of visits not made. I was not allowed to inform the veteran patients or the caregivers of my leaving and bring closure to the relationships. That is completely un-professional and is counter to our professional code of ethics. I was prevented from entering my office for over a month and when I was finally allowed to gather my personal things, I was directed not to show up earlier than the designated time (my key was taken earlier that morning) and Ms. Paynter stated "You understand you are not to show up at the office before 1:00pm, IS THAT CLEAR?") Why was it so important to stress that? It felt as if they wanted to get to the office before me to try and find something more to fault me for. Two MH administrative staff was sent to meet me to watch that I didn't take something that "belonged to the government." I was literally treated like a criminal and all of this openly done so that other staff could witness my humiliation. I was made to leave all of my personal resource files that I had developed over the years, any power points I developed or materials I developed related to the program were said to not be mine and I was not allowed to even keep a copy of my own work. Folders and Personal notebooks were grabbed out of my hand and I was not allowed to review them to remove any personal information. They were taken and it was two weeks before I was allowed to go through them (in the presence of admin. staff). No other staff person was treated like this. They were told to clean out their desks but no one went with them and they were told to just go when they could. I was seriously treated like a criminal and completely on display for all the staff to see. Maybe that was an intimidation tactic toward them so they don't dare question anything like I did or talk with central office.

Facilities I had recruited and established good relationships with and brought from deficient to deficiency free have been dropped from the program because the supervisor decided to change the travel distance which is not in line with the National goals of rural outreach and working to maintain veterans in their communities. Many of the veterans at these homes are now lost to follow up. Staff continues to place veterans without waivers in these homes and other non approved homes which are not VA inspected or monitored. This is in violation of the federal law as well. Other examples: I was ordered not to follow the directions of National leadership in how the diagnosis of dementia was to be coded. I was told not to follow up with several veterans placed in our approved homes. All veterans in our homes were to be given the option for case management but always are to be included in the monitoring and compliance activities, yet I was told not to. Other examples: I was told not to admit veterans that were not mental health patients which was clearly discriminatory as the law does not exclude any veteran who needs that level of care. I was told not to assist veterans in obtaining resources to cover the cost of their placements which is clearly stated in the program handbook as one of the roles of the program. I was told not

to talk to anyone at the medical center without first going through the supervisor. How can anyone be in charge of a program and coordinate program activities if they are prevented from talking to key staff and working on collaborative resolutions? (Clearly a control tactic on the part of the supervisor and chief as I had been able to accomplish complete development of the program and processes prior to this supervisor) Her goal seemed to be to bring me down. Several of our goals to correct problem areas and the resolution of the ER problem were in the works yet I was stopped cold. (see time line)

There have been multiple instances of pre-selection, Older seasoned workers removed or targeted so much they voluntarily leave their positions, and many current staff who are afraid to speak up because of what repercussions may come their way. Someone needs to stop the abuse of power by these managers here and return our medical center to a place where we want to come to work rather than dread what is going to happen next and who it's going to happen to. Moral is the lowest I've ever seen it in the 26 years I've been here. Not only does my situation need be corrected but many employees at this medical center need help.

(time line documentation and attachments can be forwarded)

**What corrective action or remedy are you requesting if you prevail in your complaint?**
I would like to be returned to my former position as the CRC Program coordinator and given a public appology for the way I was wrongly treated. I would like myself and the program to be able to report to Central Office rather than the medical center leadership. I feel the Coordinator position should be a supervisory position like the other coordinator positions, as the responsibility is twice that of other programs, and should be equivalently upgraded. I would like to be re-instated on the National Advisory Board as I had to step down when I was no longer in the local position. I would like to be paid for all of the inappropriate AWOL's I was charged and the failure to honor my FMLA. I would like to see Ms. Taylor and Ms. Paynter prevented from being able to do what they did to me to any other staff and disciplined accordingly.

**Choose ONE complaint category that applies to your complaint.**
12. Reprisal for filing a non-EEO complaint, appeal, or grievance.

**Non EEO Reprisal Victim: Were you the victim of the reprisalnevictim?**
Yes

**Non EEO Reprisal Victim: First Name**

**Non EEO Reprisal Victim: Last Name**

**Non EEO Reprisal Victim: Job Title**

**Non EEO Reprisal Victim: Phone**

**Non EEO Reprisal Victim: Phone Ext**

**Non EEO Reprisal About Complaint: Briefly describe the substance of the appeal, complaint or grievance you filed.**
My original grievance was about the ongoing harassment from my supervisor for the past several years and failure to address a hostile work environment. The follow up grievance was for being wrongly removed from my position.

**Non EEO Reprisal About Complaint: When did the victim file the complaint?**
4/23/2012

**Non EEO/Personnel Actions Taken: an appointment**

**Non EEO/Personnel Actions Taken: a promotion or selection for a position**
I was not selected when i re-applied for the newly posted position that I had been removed from. The position was changed to include the flexibility I had ask for and had been denied. I was not selected for this position despite being the most qualified candidate considering I started the program in 2005/2006. An AAF under age 40 was choosen and happened to be a young lady that I hired and trained several years earlier for the case management position. I was never given the opportunity to return the program to it's previous status once the vacant position was filled. It was unreasonable to expect me to cover two jobs for that length of time.

**Non EEO/Personnel Actions Taken: a reprimand, suspension, removal or other disciplinary or corrective action;**
The proposed removal stated I did not do my job when I was the coordinator of the Residential Care Program 11 months ago and that i failed to follow directions. It also listed AWOL's.

**Non EEO/Personnel Actions Taken: a detail, transfer, reassignment, or change in duty station**
The service chief stated to me, when I ask what was the basis of the action to remove me from my position as the Program Coordinator for Residential Care, that she "can chose to re-assign someone anytime she wants." When I stated I did not understand, she stated, "there is nothing to understand." At the time of this action this is the only explaination given me.

**Non EEO/Personnel Actions Taken: a reinstatement, restoration or reemployment**

**Non EEO/Personnel Actions Taken: a decision about pay, benefits, or awards**

**Non EEO/Personnel Actions Taken: a decision about education or training**

**Non EEO/Personnel Actions Taken: an annual performance evaluation**

**Non EEO/Personnel Actions Taken: a decision to order psychiatric testing or examination**

**Non EEO/Personnel Actions Taken: any other significant change in duties, responsibilities, or working conditions.**
The agency unreasonably expected me to do two full time jobs after pulling the case manager from the program and not filling the position. The temporary need to cover the vacancy turned

into almost two years with a change in office location and increased travel to work site to almost 50 miles one way. The vacant case manager position that I was expected to cover in addition to my own job was finally approved to be filled and then I was removed from the coordinator position. This occured within a couple of weeks of filing a grievance related to the treatment I had been receiving from my supervisor for several years and her failure to address a hostile work environment.

**Non EEO/Personnel Actions Taken: Details**
Within a couple of weeks after I filed a grievance and had the 1st step meeting with my supervisor, Ms. Taylor, I was "temporarily" removed from my position. She was waiting for me to arrive at my office and proceeded to tell me I had been "temporarily" re-assigned and to report to her office at the hospital immediately. I was not allowed to finalize anything I had been working on, make return phone calls, complete patient documentation from recent visits, etc. I had to leave right then. I was given busy work looking up data. That afternoon, I was using my laptop which was the computer issued to me. Ms. Paynter, The MH Service Chief, happened to come into the office and I saw that she noticed I was using my computer. She said nothing to me. The following morning Ms. Taylor stated that HR sent her a message instructing her to take my computer and cell phone. She said Chris Rowzee (HR) sent her an e-mail about 6 pm which she stated she saw when she arrived to work. When I inquired as to why, and she stated she is just doing what she was told. I requested to be allowed to forward my personal folders off of the desk top. Ms. Taylor said she didn't know and called Ms. Paynter into her office. She ask her if she was aware that Chris Rowzee had instructed her to take my computer and phone and Ms. Paynter stated no but "if that is what she said then do it." (It appeared much like Ms. Paynter was going along with whatever Ms. Taylor was saying.) Ms. Taylor stated to her that I ask if I could forward my personal folder and Ms. Paynter very gruffly stated to me that if I had a personal folder on the computer, I was in violation of federal law and I was to hand over the computer NOW. Ms. Paynter raised her voice and it felt very intimidating and hostile. I handed Ms. Taylor my computer and proceeded to get my messages off of my phone before handing it over and she stated to me "I need the phone now." I motioned just one second as I was almost finished and she loudly and firmly said "I NEED IT NOW" as she had her hand out and practically taking it from me with a very hostile and abusive tone. I was given no explanation as to why any of this was happening. The manor at which she retrieved the computer and phone was unprofessional, humiliating, demeaning and unnecessary. I was being treated like a criminal. I contacted the union and advised that my computer and phone had been taken and that I had to sign for those through the IT department and was responsible for them. They spoke to HR (Chris Rowsee) who seemed to find humor in the request and instructed Ms. Taylor to write a statement that she had the computer and phone and was assuming responsibility. I DO NOT BELIEVE Ms. Taylor RECEIVED A MESSAGE FROM HR, BUT RATHER DID THIS ON HER OWN, AND THEN CONTACTED HR WHO BACKED HER. I ASKED THE UNION TO REQUEST THE MESSAGE BE FORWARDED but THEY TOOK HR'S WORD FOR IT and did not request it. CHRIS ROWSEE (HR) IS THE SAME PERSON WHO DIDN'T FEEL MS. TAYLOR WAS INAPPROPRIATE IN HER MESSAGE TO ME CLAIMING I HAD VIOLATED HIPPA, (a year or so previous) WHEN THE PRIVACY OFFICER I HAD ALREADY SPOKEN TO ABOUT IT CLEARLY SAID Ms. Taylor had acted INAPPROPRIATELY. I BELIEVE THEY MAY BE FRIENDS AND HAVE SOME KIND OF CONNECTION.
The grievance proceeded to step 2 in which I met with Ms. Paynter. She seemed to look through

me and was not listening to anything I was saying and had a smirk on her face the whole time. She said nothing. Even when I stated that she and I had a good working relationship before Ms. Taylor became my supervisor and that I did not understand what had changed. (I had three years of exceptional evaluations from Ms. Paynter and multiple compliments on the good job I was doing, when I reported to her directly and prior to Ms. Taylor's position) She did not verbally respond, just maintained the smirk. Several days later following this meeting, Ms. Paynter called me to her office to have me sign a paper stating I was permanently being re-assigned. I expressed that I did not understand and she said there was nothing to understand and that she could chose to re-assign someone if she wanted. I again stated I did not understand what was happening and that this felt punitive and unfair and made no sense. She said in a condescending tone of voice that this was NOT a disciplinary action and that I was still "a Coordinator" and the same grade so there was "no harm done to me." She was very pushy for me to sign the paper stating I was only signing acknowledgment of receiving the letter. She would not answer any of my questions about what was happening or offer any explanation. This decision to permanently remove me from my job came right after I had the 2nd step grievance meeting with her. At that meeting I indicated that the "temporary" re-assignment was retaliation for filing the grievance against Ms. Taylor in the first place. She denied nothing and just smiled.

The temporary re-assignment was made permanent and still with no explanation. Approximately 3 days later, my former position was re-posted. Another SW was upgraded and put in the position temporarily. I had predicted who would be assigned the position temporarily because I watched Ms. Taylor groom her for the past year. (Clearly pre-selection)

I was put in an office with multiple people and have no desk or computer or phone of my own and no place to secure my belongings. I have to use whatever happens to be available yet I was told I am still "a coordinator and no harm was done to me." This was an attack on my character and another hostile action making me appear to have done something so horrendous that I was removed. My peers and colleagues have no idea what has happened but the impression and appearance these actions leave is negative and the assumption is that I have done wrong. This has been intentional and vicious and has harmed me professionally and emotionally. My reputation has been damaged, my contributions after 26 years minimized and discarded. Peers pass me in the hall and don't make eye contact. Some have volunteered the explanation that others fear the same thing happening to them if they associate with me. I was made a "program coordinator" in name only. I was the only "coordinator" without my own office and the only "coordinator" who has ever had their laptop and phone taken away. I am not included in Coordinator meetings, ask to sit on interview panels, or function in any capacity as a coordinator. In fact, I was removed from the Coordinator email group.

The chair I was issued 10 years ago due to my back problems, and that I have taken to every location I have worked, still remains at my former office location. I have requested it multiple times with no response or resolution. I was stripped of my dignity and hidden away like a leaper.

I was given a job description that was created far below my level of experience, skills and knowledge. Generic in nature with nothing to do but gather data or whatever else she decides to have me do. Completely degrading and a demotion even if my grade and pay didn't change. When given the job description, I stated I still did not understand and I was not at all happy with

what was going on. Ms. Taylor simply stated she was "following orders." I have been humiliated and embarrassed in front of my peers. My professional reputation has been destroyed. I've been shamed and made to feel like a criminal when I didn't do anything wrong nor was I ever told about what the actions were based on. I did nothing to warrant removal from my position. This was about nothing more than control and Ms. Taylor wanting things her way and a likely cover up for wrong doing and failure to address the hostile work environment issues created by, now a former co-worker who was subsequently returned to her position in the program as if her behavior was supported.

The supervisor and chief used their positions of authority to intimidate me and sabotage my efforts. The vacant position in my program that I was instructed to independently cover in addition to my coordinator position was never filled. Dispite repeatedly advising the supervisor that I couldn't keep up with everything and that I was behind, as it was impossible to do both jobs properly. I was given no assistance and in fact a review of the program was conventiently initiated to bring attention to the areas where i was behind. The review was initiated the day after I received a message from my supervisor claiming inaccurate compliance issues etc. When the union requested the report from the review, they were given a letter written by Chris Rowzee in HR stating that the risk manager who completed the reveiw reccommended removal of the coordinator however the risk manager told the union president that she did not see much wrong in the program at all. She also had sent me a message stating that her review was not looking at individuals and that NO decision would come from her review and she was simply providing reccommendations for program challenges. I welcomed her review and offered to provide her with whatever she needed. I shared with her that I was in fact behind due to the vacant case manager position that I was trying to cover and maybe her review could help us get the case manager position filled so we could get things back on track.

I do not believe the risk manager made the reccommendation to remove the coordinator but rather that the statement made by HR was intentionally falsified. Also the other reccommendations stated in the letter were not acted upon. A formal report was never received and only a worksheet was provided. The review also did not look at the correct information. I was never consulted and it was obvious to me from what was looked at, that the supervisor had requested the review as she did not even understand the program requirements. This review is later used as a basis to remove me from Federal Service.

I re-applied for my job which I should never have been removed from in the first place and not selected. No one had more experience or was more qualified than me for the job. I had put the program together from scratch and was serving on the VA National Field Advisory Board (one of a select few coordinators in the country selected) My program was being modeled accross the country. Templates I had developed were approved by the board and reccommended for national use and I was chairing the legislative and research workgroups. I was forced to step down from this board position as I was no longer in the position at my local facility. In fact, the staff member selected (AAF under age 40) was hired and trained by me before Ms. Taylor was put in the supervisory position. I also had sat on the interview panel when Ms. Taylor was first hired at the VA as a social work case manager, only several years prior. I believe she has had a personal bias toward me and it has been her goal all along to get rid of me. There are several social workers who worked with her as a case manager who have told me that she was asking about me

back then, like "who is that karen seng?"

A week or two before I was removed, it was announced that the postion was finally going to be filled. I was given no opportunity to correct anything when it would again be fully staffed. I did not feel safe meeting with the supervisor or discussing anything with her any longer because she had repeatedly misquoted me, lied and denied things that she had said. She refused to support me in my role as the coordinator and in fact would twist things to appear other than how they actually were and give me orders that were contrary to the program functioning and designed to minimize my role as the coordinator. All of the bullying and intimidation, hostile communications with me and untruths by the supervisor is what prompted my grievence in the first place. I had endured this treatment since she became the supervisor. Prior to her being selected for that position, she had moved into a coordinator position, as I was, and we were equals. I had reccommended to the chief of the service (who was the former supervisor) that the coodinators should report to her rather than be under the new supervisor as we were seen more as equals and other coordinators were supervisors at other sites and that just made more sense to me. She assured me it would be fine and nothing would change. Yet everything changed. Allowing this supervisor to have that power was a huge mistake and things did change for the worse.

SW boarding was going on at that time and each of us was to create a functional statement that descibed the position we held. Mine was ignored and I was told the VISN said we all had to use the one they sent. It did not include a lot of the work I had been doing and the boarding was supose to go back to 2006, which is how i described the work in the functional statement that I completed. I didn't decribe the work as it was to be changed by this supervisor as I didn't know what was coming. And it was not supose to be based on the future, but rather the job we had been doing. As a member of the local SW board, tasked with review of the functional statements submitted by the supervisor, I became aware of one that was mixed up in the general staff pile. It was a request for a promotion for one of the other program coordinators who had only recently been given that position and very new to the VA. This supervisor had selectively submitted an upgrade request for this individual and when the HR person saw it, she grabbed it quickly and said "oh this doesn't belong here." That coordinator has since been made a supervisor as well.

When I was removed from my office without warning or any kind of notice, I was not allowed to complete my case documentation therefore creating more of an appearance of visits not made. I was not allowed to inform the veteran patients or the caregivers of my leaving and bring closure to the relationships. That is completely un-professional and is counter to our professional code of ethics. I was prevented from entering my office for over a month and when I was finally allowed to gather my personal things, I was directed not to show up earlier than the designated time (my key was taken earlier that morning) and Ms. Paynter stated "You understand you are not to show up at the office before 1:00pm, IS THAT CLEAR?") Why was it so important to stress that? It felt as if they wanted to get to the office before me to try and find something more to fault me for. Two MH administrative staff was sent to meet me to watch that I didn't take something that "belonged to the government." I have never been untrustworthy and is a trouble maker so to treat me like this was intentional and designed to make me appear bad to others. I was made to leave all of my personal resource files that I had developed over the years, any power points I developed or materials I developed related to the program were said to not be mine and I was not allowed to

even keep a copy of my own work. Folders and Personal notebooks were grabbed out of my hand and I was not allowed to review them to remove any personal information. They were taken and it was two weeks before I was allowed to go through them (in the presence of admin. staff). No other staff person was treated like this. They were told to clean out their desks but no one went with them and they were told to just go when they could. I was seriously treated like a criminal and completely on display for all the staff to see. Maybe that was an intimidation tactic toward others as well so they don't dare question anything like I did.

All of this has felt very much like a cover up of some kind and I've been used as the scapegoat. Multiple instances of pre-selection, Older seasoned workers removed or targeted so much they voluntarily leave their positions, and many current staff who are afraid to speak up because of what repercussions may come their way. Now 11 months later, they are using the visits that were not able to be made when I was covering two positions, as they were fully aware the entire time, as their justification to remove me from employment.

**Non EEO Reprisal Involved: Made Decision First Name**
Connie

**Non EEO Reprisal Involved: Made Decision Last Name**
Paynter

**Non EEO Reprisal Involved: Made Decision Job Title**
Chief MH&BSS

**Non EEO Reprisal Involved: Made Decision Phone**
(502) 287-4000

**Non EEO Reprisal Involved: Made Decision Phone Ext**

**Non EEO Reprisal Involved: Made Recommendation First Name**
Gaila

**Non EEO Reprisal Involved: Made Recommendation Last Name**
Taylor

**Non EEO Reprisal Involved: Made Recommendation Job Title**
Supervisor

**Non EEO Reprisal Involved: Made Recommendation Phone**
(502) 287-4000

**Non EEO Reprisal Involved: Made Recommendation Phone Ext**

**Non EEO Reprisal Involved: Approved Decision First Name**
Chris

**Non EEO Reprisal Involved: Approved Decision Last Name**
Rowsee

**Non EEO Reprisal Involved: Approved Decision Job Title**
HR Employee Relations

**Non EEO Reprisal Involved: Approved Decision Phone**
(502) 287-4000

**Non EEO Reprisal Involved: Approved Decision Phone Ext**

**Non EEO Reprisal Involved: How did the persons you just identified know about the victim's appeal, complaint, or grievance?**
Chief of the service and responsible for the supervisor whom the grievance was filed about.
Utilized HR individual who may be personally affiliated with the supervisor and/or chief.

**Enter Your Employment Status: Excepted Service**
Other

**Required Signature**
karenseng

**Consent Statement**

**Consent Statement 1**
I *consent* to OSC's communication with the agency involved in my complaint. I agree to allow
OSC to disclose my identity as the complainant, and information from or about me, to the agency
if OSC decides that such disclosure is needed to investigate the allegation(s) in my complaint
(for example, to request information from the agency, or seek a possible resolution through
mediation or corrective action). I understand that regardless of the Consent Statement I choose,
OSC may disclose information from my complaint file when permitted by the Privacy Act
(including circumstances summarized in Part 5, below).

**Consent Statement Signature**
karenseng